# EXHIBIT 7



# *Brown v. Clayton*

United States District Court for the District of Connecticut

April 8, 2013, Decided; April 8, 2013, Filed

CIV. NO. 3:11CV714 (JCH)

**Reporter**
2013 U.S. Dist. LEXIS 50140; 2013 WL 1409884

GEORGE BROWN v. OFFICER IVAN J. CLAYTON [1]

**Prior History:** *Brown v. Clayton, 2012 U.S. Dist. LEXIS 106715 (D. Conn., July 31, 2012)*

**Counsel:** [*1] For George Brown, Plaintiff: Sally A. Roberts, LEAD ATTORNEY, Law Office of Sally A. Roberts, LLC, New Britain, CT.

For Ivan J. Clayton, Defendant: Arthur C. Laske, III, LEAD ATTORNEY, Office of the City Attorney - Bpt, City of Bridgeport, Bridgeport, CT; Betsy Edwards, LEAD ATTORNEY, City of Bridgeport, Office of the City Attorney, Bridgeport, CT.

**Judges:** HOLLY B. FITZSIMMONS, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** HOLLY B. FITZSIMMONS

# Opinion

## RULING ON PENDING DISCOVERY MOTIONS

Plaintiff brings this civil rights action pursuant to *42 U.S.C. §1983*, alleging excessive force and unreasonable search and seizure in violation of the United States Constitution. [Compl. Doc. #1]. Defendant Ivan Clayton is a police officer for the City of Bridgeport. Pending is plaintiff's Motion to Quash [Doc. #74] and Motion to Compel. [Doc. #75]. A discovery conference was held on February 21, 2013.

## Plaintiff's Motion to Quash [Doc. #74]

Plaintiff moves pursuant to *Fed. R. Civ. P. 45(c)(3)(A)(iii)* to Quash the Subpoena Duces Tecum served on non-party Markle Investigations, Inc. in connection with a deposition scheduled for February 7, 2013, on the grounds of attorney work product privilege. The parties have not reviewed the documents [*2] that are the subject of this motion. The privilege is being asserted by Attorney Frank J. Riccio, II, plaintiff's former counsel.

It is HEREBY ORDERED that,

Markle Investigations, Inc. will provide the following documents responsive to the January 24, 2013, Notice of Deposition to the Court for in camera review within seven (7) days.

1. Every file in the possession or control of Markle Investigations, Inc., or that can be retrieved with reasonable efforts by Markle Investigations, Inc., relating to the above-captioned case and/or the above described warrant service;

2. All materials and data in any form in the possession or control of any agent, servant or employee of Markle Investigations, Inc. or that can be retrieved with reasonable efforts by Markle Investigations, Inc., whether or not kept in a specific "file" on this matter, that relate in any way to the above-captioned case and the above-described warrant service, including but not limited to any written or email correspondence with any person; statements; text messages or other electronic communications with any person; notes; all documents provided from any source; photographs; audio/video recordings; other electronic media or [*3] data; billing records; time sheets; other financial documentation, drafts, outlines, or any other documents, whether kept in paper copy or electronic format, not specifically referenced herein that relates in any way to the above-captioned case and/or the above-described warrant service.

---

[1]   A Stipulation of Dismissal was filed on February 5, 2013, dismissing the claims against the other defendants. [Doc. #78].

Defendant's counsel will serve this order on Markle Investigations, Inc. and provide a copy of this order to Attorney Riccio. Any objection to this order may be raised by Markle Investigations, Inc. through its counsel. In light of the assertion of privilege by Attorney Riccio, if he has information to provide to the Court regarding the circumstances under which he retained Markle Investigations, Inc., he may contact the Court. The Court will decide the Motion to Quash based on an *in camera* review and any further proceedings.

Accordingly, a ruling on the Motion to Quash **[Doc. #74]** is **RESERVED.**

<u>Plaintiff's Motion to Compel Discovery Compliance Against Defendant Ivan Clayton [Doc. #75]</u>

Plaintiff seeks an order compelling defendant to produce documents responsive to Request for Production No. 10 dated January 10, 2012 and in Schedule A to the Re-notice of deposition ("Schedule A"), dated April 24, 2012. **[Doc. [\*4] #75].** For the reasons that follow, the Court finds that plaintiff waived his right to file a motion to compel, pursuant to Judge Hall's Standing Order [doc. #22 at 2], and for the reasons stated in the Court's July 12, 2013 ruling, [doc. #55].

Judge Hall's Scheduling Order [Doc. #22] mandates that,

> Any motion for an order compelling disclosure or discovery pursuant to *Fed. R. Civ. P. 37(a)* must be filed within 30 days after the due date of the response. **Failure to file a timely motion in accordance with this scheduling order constitutes a waiver of the right to file a motion to compel.**

[Doc. #22 at 2 (bold in original)].

On this record, plaintiff failed to file a timely Motion to Compel a response to request for production No. 10 dated January 10, 2012, and a response to Schedule A dated April 24, 2012, within thirty days after the due date of defendant's response.

Plaintiff also failed to comply with the meet and confer requirements set forth in *Fed. R. Civ. P. 37(a)(2)*, *D. Conn. L. Civ. R. 37(a)(2)*; and the Court's ruling dated July 31, 2012. [Doc. #55]. [2]

The meet-and-confer requirement mandates that:

> [Parties must] meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining . . . what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention.

*Messier v. Southbury Training School, No. 3:94-CV-1706, 1998 U.S. Dist. LEXIS 20315, 1998 WL 841641, at \*3 -4 (D. Conn. 1998)* (quoting *Deckon v. Chidebere, No. 93Civ7845 (LMM)(BAL), 1994 U.S. Dist. LEXIS 12778, 1994 WL 494885, at \*5 (S.D.N.Y. Sept. 9, 1994))*. The failure to follow the meet and confer requirement is a

---

[2]   ***Federal Rule of Civil Procedure 37(a)(2)*** provides in pertinent part that

> (A) [i]f a party fails to make a disclosure required by ***Rule 26(a)***, [\*5] any other party may move to compel disclosure and for appropriate sanctions . . . . The motion must include a certification that the movant has in good faith attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action.

***Fed. R. Civ. P. 37***.

Local Rule 37 provides, in pertinent part, that

> [n]o motion pursuant to ***Rules 26 through 37, Fed. R. Civ. P.***, shall be filed unless counsel making the motion has conferred with opposing counsel and discussed the discovery issues between them in detail in a good faith effort to eliminate or reduce the area of controversy, and to arrive at a mutually satisfactory resolution.

D. Conn. L. Civ. R. 37(a)(2). <u>See</u> [Doc. #55 at 2-4].

sufficient basis for denying the motion to compel. [3] *Myers v. Andzel, 06 CIV. 14420 (RWS), 2007 U.S. Dist. LEXIS 79157, 2007 WL 3256865 (S.D.N.Y. Oct. 15, 2007)*(denying plaintiff's motion under *Fed. R. Civ. P. 37* because plaintiff failed to meet and confer with defendant).

The July 12, 2012 ruling contains the following order.

> Any effort to renew the motion to compel production of documents on Schedule A . . . must comply with *Fed. R. Civ. P. 37(a)(2)* and *D. Conn. L. Civ. R. 37(a)(2)*. The parties will contact the Court to schedule a discovery conference before filing any further discovery motions on this issue.

[Doc. #55 at 3].

With regard to request for production No. 10, plaintiff did not comply with the "meet [*7] and confer" requirement under *Fed. R. Civ. P. 37(a)(2)* and *D. Conn. L. Civ. R. 37(a)(2)*, nor has plaintiff propounded a reasonable explanation for why he should be excused from complying with *Rule 37(a)(2)* and *Local Rule 37 (a) (2)* [4].

Moreover, this is the second time that plaintiff has sought the Court's intervention to order production of documents requested in Schedule A. Plaintiff did not file an objection to the Court's July 12, 2013 ruling. In renewing the Motion to Compel documents requested in Schedule A, plaintiff has failed to comply with the Court's July 12 order prior to filing this motion and has offered no valid reason for failing to do so.

Accordingly, plaintiff's Motion to Compel **[Doc. #75]** is **DENIED.**

### Color Booking Photos

Defendant agreed to provide color booking photos of plaintiff listed on defendant's exhibit list to plaintiff's counsel within seven days.

### Further Discovery Requests

Plaintiff's request for  [*8] a copy of defendant Clayton's personnel file, disciplinary file and civilian complaints, and Bridgeport Policy Department Policy and Procedure Manual and Use of Force Policy is DENIED as waived. The Court finds that plaintiff has failed to propound a reasonable explanation for why he should be excused from complying with *Rule 37(a)(2)* and *Local Rule 37(a)(2)* or this Court's order.

### CONCLUSION

The Court **RESERVES** decision on plaintiff's Motion to Quash **[Doc. #74]** until after an in camera review of the documents responsive to the Markle Investigations Inc. subpoena dated January 24, 2013.

Plaintiff's Motion to Compel **[Doc. #75]** is **DENIED.**

Counsel are encouraged to contact the Court to schedule a conference as issues arise.

This is not a recommended ruling. This is a discovery ruling and order which is reviewable pursuant to the "clearly erroneous" statutory standard of review. *28 U.S.C. §636 (b)(1)(A)*; *Fed. R. Civ. P. 6(a)*, *6(e)* and *72(a)*; and Rule 2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

SO ORDERED at Bridgeport this 8th day of April 2013.

/s/ HOLLY B. FITZSIMMONS

UNITED  [*9] STATES MAGISTRATE JUDGE

---

[3]   The Court cautions the parties that "[f]ailure to hold a good faith conference is ground for the award of attorney's fees and other sanctions." *Krishnakumar v. Dunkin' Donuts, Inc., 00CIV.1755(WHP)(DFE), 2000 U.S. Dist. LEXIS 17903, 2000 WL 1838319, *1 (S.D.N.Y. Dec. 12, 2000)*(citing *28 U.S.C. § 1927*; *Apex Oil Co. v. Belcher Co., 855 F.2d 1009, 1019-20 (2d Cir.1988)*).

[4]   "Courts have excused a failure to meet and confer in situations where to do so would be clearly futile, or exigent time constraints mandate immediate action." *Excess Ins. Co., Ltd. v. Rochdale Ins. Co., 05 CIV. 10174, 2007 U.S. Dist. LEXIS 74193, 2007 WL 2900217 (S.D.N.Y. Oct. 4, 2007)*(citations omitted).



## *Calabrese v. CSC Holdings, Inc.*

United States District Court for the Eastern District of New York

March 7, 2007, Decided ; March 7, 2007, Filed

02-CV-5171 (DLI)(JO)

**Reporter**

2007 U.S. Dist. LEXIS 16059; 2007 WL 749690

CALABRESE et al., Plaintiffs, -against- CSC HOLDINGS, INC. et al., Defendants.

**Subsequent History:** Class certification denied by *Calabrese v. CSC Holdings, Inc., 2009 U.S. Dist. LEXIS 13119 (E.D.N.Y., Feb. 19, 2009)*

**Prior History:** *Calabrese v. CSC Holdings, Inc., 2006 U.S. Dist. LEXIS 99681 (E.D.N.Y., Mar. 6, 2006)*

**Counsel:** [*1]  For Cira Calabrese, and those similarly situated, Steven Schiff, Sylvia Howell-Fridie, Ralph Reel, Stewart Kalter, Anthony Fiore, Mel Gevanter, Plaintiffs: Harry J. Binder, LEAD ATTORNEY, Binder & Binder, P.C., Ronkonkoma, NY; Charles E. Binder, Binder and Binder, New York, NY.

For CSC Holdings, Inc. also known as Cablevision, James F. Magee, Robert Astarita, Amy Groveman, Defendants: George C. Pratt, James M. Wicks, LEAD ATTORNEYS, Jennifer M. Mone, Jessica Nagle Martin, Eric Wilen Penzer, Farrell Fritz, P.C., Uniondale, NY.

For Shaun K. Hogan, Daniel J. Lefkowitz, Wayne R. Louis, Patrick J. Sullivan, Lefkowitz, Louis and Sullivan, L.L.P., Defendants: Matthew K. Flanagan, LEAD ATTORNEY, L'Abbate, Balkan, Colavita & Contini, LLP, Garden City, NY.

For Allied Account Services Inc., Defendant: Jessica Nagle Martin, Eric Wilen Penzer, Farrell Fritz, P.C., Uniondale, NY.

For Shaun K. Hogan, Counter Claimant: Matthew K. Flanagan, L'Abbate, Balkan, Colavita & Contini, LLP, Garden City, NY.

For Lefkowitz, Louis and Sullivan, L.L.P., Shaun K. Hogan, Daniel J. Lefkowitz, Wayne R. Louis, Patrick J. Sullivan, Counter Defendants: Matthew K. Flanagan, L'Abbate, Balkan, Colavita [*2]  & Contini, LLP, Garden City, NY.

**Judges:** DORA L. IRIZARRY, United States District Court Judge.

**Opinion by:** DORA L. IRIZARRY

# Opinion

## MEMORANDUM AND ORDER

**DORA L. IRIZARRY, U.S. District Judge:**

The litigation tactics employed in this case would test the patience of even the most forgiving federal district court judge. The problem appears to emulate from the parties' refusal to accept the finality of the court's decisions, choosing instead to make motions to reconsider and appeal the decisions of the court repeatedly. Neither party is without blame -- in fact, it seems that both plaintiffs and defendants are content to engage in procedural trench warfare on in the battlefield of discovery, with the decisions, orders and respect for the court becoming collateral damage. The aim of this Memorandum and Order is to finally resolve one of the most intractable issues in this action: what discovery is permitted from ″nonparty potential class

2007 U.S. Dist. LEXIS 16059, *5

members" ("NPCM"). [1] [*4] NPCMs are individuals who might be members of a class if certification is later granted, but who are not yet, and may never be, a party to the litigation. For the reasons set forth below, defendants' appeal from U.S. Magistrate [*3] Judge James Orenstein's Order dated May 24, 2006 denying defendants' motion for reconsideration of his denial of certain discovery is dismissed. [2]

In this action, plaintiffs allege a scheme by defendants [3] to defraud cable subscribers who purchased certain cable equipment ("pirate boxes") by falsely accusing these cable subscribers of stealing cable in an attempt to obtain a settlement, in violation of state and federal laws. Plaintiffs' strategy during the last [*5] two years focused on obtaining discovery from defendants to broaden their class by finding additional victims of the alleged scheme (NPCMs), while at the same time preventing defendants from obtaining reciprocal discovery regarding the NPCMs. Defendants, for their part, have sought the exact opposite: to prevent plaintiffs from obtaining records which would allow them to broaden their class while, at the same time, attempting to obtain reciprocal discovery from NPCMs to pick off potential plaintiffs (NPCMs) who will be unable to prove their claims, or perhaps simply to make the class certification process as onerous as possible for both the NPCMs and plaintiffs.

### Background

United States District Judge Joanna [*6] Seybert's decision of September 5, 2003 (Docket No. 46) contains the genesis of the dispute regarding what discovery should be permitted from NPCMs. The September 5, 2003 decision denied

plaintiffs' motion for class certification on the grounds that the plaintiffs had failed to satisfy the numerosity requirement of *Fed. R. Civ. Pro. 23(a)(1)* because they had not provided a reasonable estimate of the number of class members. *Calabrese v. CSC Holdings, Inc.,* 02-CV-5171 (E.D.N.Y. Sep. 5, 2003) (Docket No. 46). Judge Seybert found that plaintiffs had not provided a reasonable estimate of the number of class members because they had defined the putative class as "CSC's cable television subscribers in New York State who have been victimized by Defendants' scheme." *Id.* Judge Seybert held that:

> the Court finds that the only individuals 'victimized' by the Defendants' 'scheme' are those who can plead that they did not in fact use the pirate box to intercept cable programing service. Plaintiffs' putative class can therefore only consist of those individuals who will allege that they did not use the pirate boxes to intercept cable programing service. The Plaintiffs have not made [*7] any attempt to establish that there are a large number of individuals that will fit into this class, or even to 'reasonably estimate' the number. In fact, even accepting all of the Plaintiffs' allegations as true, there is no indication that the Plaintiffs' class will consist of any individuals beyond those named in the Complaint. As such, the Plaintiffs have failed to establish the numerosity requirement and no class can be certified.

> Although the Plaintiffs' motion must be denied for failure to satisfy *Rule 23(a)(1)*, the Court will deny this motion without prejudice.

---

[1]   As explained in more detail in the background portion of this Memorandum and Order, the issue comes before the court on a *28 U.S.C. § 636(b)(1)(A)* motion to reconsider a May 24, 2006 Minute Order of United States Magistrate Judge James Orenstein (ECF Docket No. 298) denying the application of defendants Shaun K. Hogan, Daniel J. Lefkowitz, Wayne R. Louis, Patrick J. Sullivan and Lefkowitz, Louis & Sullivan, L.L.P. ("the Attorney Defendants") to compel production of the names of 240 NPCMs. (ECF Docket No. 308). Judge Orenstein later denied the Attorney Defendants' motion for reconsideration of this order. (ECF Docket No. 306). The court notes that this, therefore, is the third time the court is considering the Attorney Defendants' motion. The court expects that whichever party feels aggrieved by this Memorandum and Order will make a motion requesting the court reconsider. However, in the absence of a change in controlling law or a change in material facts, the parties are cautioned that a motion to reconsider may result in the imposition of sanctions.

[2]   In determining the issue, the court is governed by the law of the case and has not upset or overturned prior decisions in this case by other district court judges. *See Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 166 (2d Cir 2003) ("[w]e have limited district courts' reconsideration of earlier decisions . . .by treating those decisions as law of the case, which gives a district court discretion to revisit earlier rulings in the same case, subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'") (quoting *Zdanok v. Glidden Co.,* 327 F.2d 944, 953 (2d Cir. 1964)).

[3]   In addition to the Attorney Defendants, the other defendants are CSC Holdings, Inc., James F. Magee, Robert Astarita, Amy Groveman and Allied Account Services, Inc. For the purposes of his Memorandum and Order, all defendants will be collectively referred to as "defendants," unless otherwise noted.

*Id.* at 6-7. Plaintiffs initially made a motion to reconsider the September 5, 2003 order (ECF Docket No. 51), but withdrew the motion in exchange for being permitted to file a third amended complaint (ECF Docket No. 49). After serving the amended complaint, plaintiffs requested that United States Magistrate Judge Arlene R. Lindsay, then assigned to the case, allow discovery to go forward on the issue of numerosity. (ECF Docket No. 55). The defendants objected to the plaintiffs' application and requested discovery be limited to the named plaintiffs. (ECF Docket Nos. 56, 57). On October 9, 2003, Judge [*8] Lindsay permitted discovery to go forward on the issue of numerosity. (ECF Docket No. 58). Both parties appealed the magistrate judge's order. (ECF Docket Nos. 60, 65, 75). The crux of plaintiffs' objections was that the court should not allow discovery of "absent class members," later defined as NPCMs. *Id.* Defendants asked for reconsideration of the order because they wished to have more discovery from NPCMs. *Id.* On November 12, 2003, Judge Lindsey denied defendants' motion for reconsideration and ruled that plaintiffs were to provide a reasonable estimate of the number of class members as well as additional information about the NPCMs demonstrating that class certification was appropriate. (ECF Docket No. 60, Endorsed Order). Under the order, defendants were permitted additional discovery of the NPCM. Likewise, plaintiffs were permitted numerosity discovery from defendants, even after the numerosity requirement was met. *Id.*

On December 18, 2003, Judge Seybert issued a Memorandum and Order dismissing plaintiffs' appeal of Judge Lindsay's October 9, 2003 order. (ECF Docket No. 78). Judge Seybert reaffirmed her September 5, 2003 decision requiring plaintiffs to make a "reliable [*9] showing . . . that a substantial number of individuals can be identified who can affirmatively plead that they were defrauded by the Defendants' -- that is that (1) they did not in fact use a pirate box and (2) they did in fact rely on Defendants' representations." *Id.* at 4. Judge Seybert went on to state that plaintiffs are permitted discovery "to allow plaintiffs access to the information that they will need in order to make the showing required of them." *Id.* at 6. Similarly, Judge Seybert found that defendants have the right to discovery regarding "the claims of putative class members." *Id.* Concerned that the parties might construe Judge Lindsay's order "to allow the parties to engage in discovery well beyond the scope of the issues intended," Judge Seybert modified the order, directing that "[t]he parties shall narrowly tailor all discovery requests to these issues and shall not attempt to engage in discovery relating to the substance of the claims of unnamed potential class members, except to the extent the substance of the claims relates to the inclusion of said parties in the class." *Id.* To prevent abuse, defendants' discovery requests served on the NPCMs were [*10] required to be in writing. *Id.*

Plaintiffs moved for reconsideration of Judge Seybert's December 18, 2003 Memorandum and Order. (ECF Docket No. 87). On August 17, 2004, Judge Seybert issued another Memorandum and Order denying the motion to reconsider and reaffirming her prior decisions:

> As Plaintiffs correctly point out, this class has not yet been certified, which precludes the potential class members from technically being classified as 'absent class members.' However, it would not be prudent to classify these potential class members as 'non-parties.' This case presents special circumstances in that Plaintiffs, on the one hand, would like to include these 'non-parties' in the putative class, but, on the other hand, wish to preclude Defendants from reciprocal discovery on the issue of numerosity concerning these same 'non-parties.' The Court does not agree with Plaintiffs' contentions and to the extent that it was unclear in the December 18, 2003 Order, the Court is clarifying that the Plaintiffs have the burden of establishing numerosity and that they may engage in discovery in order to determine whether there are individuals, other than those already named as Plaintiffs [*11] in this action, who qualify for inclusion in the class. The Court also intends that the Defendants have a reciprocal right to limited, relevant discovery concerning whether the individuals identified by the Plaintiffs as potential class members actually qualify as members of the class, so that they may have the opportunity to disprove numerosity. As such, this limited discovery may only relate to the issue of whether potential class members qualify for inclusion in the class, within the limits set forth in this, and the previous, orders of the Court.

*Id.* at 12. On August 27, 2004, Judge Seybert lifted the stay previously imposed on this discovery. (ECF Docket No. 155). On September 17, 2004, plaintiffs appealed Judge Seybert's August 17, 2004 Memorandum and Order to the Second Circuit. (ECF Docket No. 160). [4] Plaintiffs also moved for a stay of the August 17, 2004 Memorandum and Order pending the appeal, which was ultimately denied.

---

[4]   The case was reassigned to the Honorable Dora L. Irizarry on September 13, 2004.

(ECF Docket No. 168). The appeal was dismissed by the Second Circuit on February 23, 2005 for lack of jurisdiction. (ECF Docket No. 201).

[*12]   The defendants' entitlement to discovery from NPCMs having been addressed, and the discovery obligations of the parties being reasonably well established, on April 7, 2005, Judge Orenstein held a discovery conference and asked the parties to provide a report addressing all outstanding discovery matters. (ECF Docket No. 221). [5] On the issue of discovery from NPCMs, Judge Orenstein proposed that plaintiffs identify the NPCMs by an *in camera* submission, *ex parte,* and provide a redacted version to defendants. The *in camera* submissions would allow potential class members to attest to their membership in the proposed class, in a form affidavit to be agreed to by both parties. *Id.* Predictably, plaintiffs wished to keep the identities of the NPCMs anonymous while defendants wanted disclosure of the identities of the NPCMs, ostensibly to allow the defendants to serve additional discovery on the NPCMs. (ECF Docket No., 230, 232). On May 18, 2005, Judge Orenstein ruled that plaintiffs must provide "unredacted affidavits from all potential absent class members. . . by June 16, 2005." (ECF Docket No. 236). The deadline was later extended to June 24, 2005. (ECF Docket No. 240, [*13]  Endorsed Order). On June 24, plaintiffs provided thirty-four unredacted affidavits from NPCMs, each of which attested to the individual's membership in the potential class. Plaintiffs now had a putative class of forty, the minium needed to satisfy the numerosity requirements. (ECF Docket No. 242). However, on June 29, 2005, Judge Orenstein clarified his May 18, 2005 Order and directed plaintiffs to provide unredacted affidavits from "all potential absent class members, not simply the minimum needed to satisfy the numerosity requirement for maintaining a class action." (ECF Docket No. 243). On July 27, 2005, plaintiffs provided more than sixty affidavits from NPCMs attesting to their membership in the class, as well as a list of hundreds of other NPCMs from whom plaintiffs could not get affidavits for one reason or another. (ECF Docket No. 247). Claiming that the numerosity requirement was satisfied, plaintiffs asked the court to certify the class. *Id.* Several additional affidavits from potential class members were provided on August 17, 2005. (ECF Docket No. 251).

[*14]   Defendants, however, were not satisfied with the affidavits and sought to take additional discovery from the NPCMs, asserting that Judge Seybert's and Judge Lindsay's prior rulings permitted them to do so. (ECF Docket No. 253-254, 257, 258, 260). Plaintiffs, however, took the position that additional discovery from NPCMs was an "anathema to the very concept of Class Action litigation." (ECF Docket No. 262). On December 27, 2005, Judge Orenstein decided the issue in favor of plaintiffs and limited the defendants' discovery to "interrogatories that test the numerosity issue by seeking information *about* nonparty potential class members, but not *from* them." (ECF Docket No. 269). Defendants promptly moved for reconsideration of the December 27, 2005 order because they believed that Judge Seybert's prior orders allowed them more expansive discovery, directly from NPCMs. On March 7, 2006, Judge Orenstein granted the defendants' motion for reconsideration on the grounds that his ruling was inconsistent with prior rulings in the case made by Judge Seybert and allowed defendants to serve "limited interrogatories" directly on the NPCMs. (ECF Docket No. 287). Plaintiffs, predicably, asked [*15]  for reconsideration of the March 7, 2006 Order. (ECF Docket No. 298, 306). Reconsideration was denied. (Docket No. 306). To exercise their rights to additional discovery from the NPCMs, defendants requested that the court compel production of the names of 240 NPCMs. Judge Orenstein denied the request in a May 24, 2006 Civil Conference Minute Order. (ECF Docket No. 298). Defendants then moved for reconsideration of the denial of their motion to compel the identities of the 240 NPCMs. (ECF Docket No. 304). The motion for reconsideration was denied. (ECF Docket No. 306).

In the instant motion, defendants now appeal from Judge Orenstein's denial of their motion for reconsideration of his denial of their motion to compel production of the identities of the 240 additional NPCMs, ostensibly so defendants can obtain additional numerosity discovery from the NPCMs. For the reasons set forth below, defendants' appeal is dismissed.

---

[5]   In an April 15, 2005 submission responding to Judge Orenstein's April 7th Order, defendants, apparently for the first time and in an act of brazen gamesmanship, stated that they could not turn over certain discovery related to numerosity because the "Privacy Act" forbids cable providers from turning over certain subscriber information without the subscriber's consent. (ECF Docket No. 222). Defendants construed the Privacy Act to prohibit the numerosity discovery sought by plaintiffs, namely the identity of the allegedly thousands of subscribers who the defendants accused of purchasing pirate boxes. *Id.* Defendants proposed that plaintiffs identify the potential class members, all of whom are cable subscribers accused of purchasing pirate boxes, and then defendants would release information about those particular subscribers, since the participating subscribers would be deemed to have consented to the disclosure under the Privacy Act. In an April 18, 2005 Civil Conference Order, Judge Orenstein requested that the parties brief issue of the implications of the Privacy Act on discovery. (ECF Docket No. 226). Its unclear how this issue was resolved, but in the end defendants provided numerous documents to plaintiffs, without Privacy Act implications. ("Phase III documents."). (ECF Docket No. 252).

## Discussion

Out the outset, the court notes that the parties have an affinity for moving for reconsideration of orders of the court. Motions for reconsideration are not to be made simply because a party disagrees with the court's decision, but rather should [*16] only be made when there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)*. Similarly, the court's plenary power to review its own interlocutory orders may be applied in circumstances "when it is consonant with justice to do so." *U.S. v. LoRusso, 695 F.2d 45, 53 (2d Cir. 1983)*. The parties in this action, however, have rarely cited anything more than a disagreement with the court's decisions when making a motion for reconsideration, creating a system whereby the winner appears to be the party who prevails on the motion two out of the three times it is brought before the court, a system that both lacks efficiency and shows a disrespect for the court's decisions. With respect to the instant motion, <u>28 U.S.C. § 636</u> provides that a district judge "may reconsider" any pretrial matter decided by a magistrate judge "where it has been shown that the magistrate judges order is clearly erroneous or contrary to law." *Id.* Judge Orenstein's March 7, 2006 and [*17] May 24, 2006 Civil Conference Minute Orders were neither "clearly erroneous" nor "contrary to law" and this court will not set them aside.

Judge Seybert's decisions of December 18, 2003 and August 17, 2004 clearly entitle defendants to limited discovery from NPCMs and further allow the discovery demands to be served directly upon the NPCMs, rather than upon the named plaintiffs. Plaintiffs' counsel has expended a tremendous amount of energy seeking to undo these decisions, including numerous objections, motions to reconsider, two appeals to the Second Circuit and a motion for a stay of the August 17, 2004 order. Plaintiffs have even strained their credibility with a completely spurious argument that the court's referral of their motion to stay enforcement of Judge Seybert's August 17, 2004 order to Judge Orenstein allowed Judge Orenstein to somehow alter the law of the case with respect to the discovery that could be served upon NPCMs. [6]

[*18]   Plaintiffs' energy would have been better spent

determining the scope of discovery permitted under Judge Seybert's decisions, namely how to most effectively identify NPCMs who (1) did not in fact use a pirate box and (2) did in fact rely on defendants' representations. Almost by accident, the plaintiffs did exactly that, and have provided more than sixty affidavits from NPCMs attesting to their membership in the class, thus providing defendants the limited discovery of the NPCMs envisioned by Judge Seybert. (ECF Docket No. 242, 247). With respect to the instant motion, to the extent that plaintiffs are confident that the information provided by the more than sixty NPCMs who have submitted affidavits attesting to their membership in the class established numerosity, the court will not disturb Judge Orenstein's denial of defendants' motion to compel the production of the identities of the remaining NPCMs. Thus, although the plaintiffs must respond to the limited written discovery served upon the previously identified NPCMs, if plaintiffs do not wish to reveal the identities of the additional NPCMs, the court will not require them to do so. Of course, plaintiffs proceed at their own [*19] risk since their ability to meet the numerosity requirements of *Fed R. Civ. Pro. 23(a)(1)* depends upon the number of NPCMs who can attest that they (1) did not in fact use a pirate box and (2) did in fact rely on defendants' representations, in accordance with Judge Seybert's December 18, 2003 Memorandum and Order.

The court's holding comports with the Second Circuit's recent decision in *In re Initial Public Offering Securities Litigation, 471 F.3d 24 (2d Cir. 2006)*. In *In re Initial Public Offering Securities Litigation,* the Second Circuit held that the court is required to "resolve factual disputes relevant to each Rule 23 requirement" even where those determinations overlap or are identical to "a merits issue." *Id at 42*. Likewise, it should not be forgotten that plaintiffs bear the burden of demonstrating numerosity. *Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2d Cir 1999)* ("[t]he party seeking to certify a class bears the burden of demonstrating numerosity, commonality, typicality, and adequacy."). The Circuit also provided the court with a framework for resolving disputed class certifications issues, such as [*20] this one: the district court is required to be sure that enough pre-certification discovery is provided so that it is satisfied that each Rule 23 requirement has been met, without receiving so much discovery that "a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation." *In re Initial Public*

---

[6]   The plaintiffs' arguments are further muddled because the issue was not whether Judge Orenstein has the power to overrule Judge Seybert when referred a motion from another district judge, an issue that the court need not address, but rather whether altering the decision with respect to discovery from NPMC was warranted, which, upon reconsideration, Judge Orenstein correctly determined it was not.

*Offering Securities Litigation, 471 F.3d at 41*.

Applying the Circuit's holdings to this matter, in determining whether class certification is appropriate, the court will evaluate whether the plaintiffs have met the numerosity requirement and will examine whether the members of the putative class used the pirate boxes and relied on the defendants' representations. The court is skeptical that additional discovery from NPCMs will affect the plaintiffs' certification motion because the court is already aware that there are more than sixty NPCMs who meet Judge Seybert's requirements. So long as plaintiffs are confident of being able to satisfy the numerosity requirement, additional discovery from the NPCMs is not necessary or warranted.

To the extent that defendants are seeking additional discovery from the NPCMs on the commonality [*21] prong of the class certification test, (to demonstrate that the NPCMs have individual issues with respect to the use of the pirate box and with respect to their reliance, issues that predominate over the issues common to the class), the court previously rejected defendants' argument. *See Calabrese v. CSC Holdings, Inc.,* 02-CV-5171, slip op. 15-16. (E.D.N.Y. Sep. 5, 2003) (Docket No. 46). Judge Seybert previously stated that:

> [t]he court notes that there are a numerosity of individual issues of fact, resolution of which is essential to the final adjudication of this case. The court recognizes that these individual issues may require separate "mini-trials" and may substantially slow the adjudication of this case. However, as a whole, the court finds that common issues of fact and law . . . predominate this action.

*Id.* at 16. Thus, whether each individual NPCMs can prove that they did not use the pirate boxes and relied on the defendants' representations, as they swear in the affidavits submitted to the court, can be tested at a later time and should not be addressed by additional pre-certification discovery. [7] *See In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 140 (2d Cir 2001)* [*22] (upholding class certification while noting that individualized issues of damages and mitigation might require individualized inquiry); *Green v. Wolf Corp., 406 F.2d 291, 300-01 (2d Cir.1968)* ("[t]he district court may use the procedures suggested by *Rule 23* to cope with the [distinctions between plaintiffs], if, indeed, they exist."). Additional discovery for the purpose of establishing (or defeating) the commonality of claims among the putative class is denied.

[*23]   Defendant's appeal is dismissed because the court finds that the numerosity discovery provided by plaintiffs satisfies Judge Seybert's previous orders. Defendants are not entitled to any further discovery from NPCMs. In accordance with prior orders of this court, plaintiffs are directed to respond to all outstanding discovery requests which were served upon the identified NPCMs prior to the filing of this Memorandum and Order. Defendants shall file a letter with the court within five (5) days of receiving the outstanding NPCM discovery, notifying this court of the same, at which point the court will set a briefing schedule for the class certification motion. [8] Once class certification is addressed, parties may request permission to move for summary judgement, if desired.

[*24]   SO ORDERED.

DATED: Brooklyn, New York

March 7, 2007

DORA L. IRIZARRY

United States District Court Judge

---

[7]   The court notes that it is uncommon for a defendant to seek names of NPCMs. It is much more common for a plaintiffs seek the names of NPCMs in an attempt to broaden their class, a tactic courts disfavor. *See Dziennik v. Sealift, Inc.,* 05 CV 4659, 2006 U.S. Dist. LEXIS 33011, 2006 WL 1455464 *1 (E.D.N.Y. May 23, 2006)*("[c]ourts have ordinarily refused to allow discovery of class members' identities at the pre-certification stage out of concern that plaintiffs' attorneys may be seeking such information to identify potential new clients, rather than to establish the appropriateness of certification.

[8]   It appears that plaintiffs served a motion for class certification upon defendants sometime in April of 2006, but never filed the motion with the court. That motion is terminated without prejudice to renew in accordance with the results of NPCM discovery.



## *Dziennik v. Sealift, Inc.*

United States District Court for the Eastern District of New York

May 23, 2006, Decided

05-CV-4659 (DLI) (MDG)

**Reporter**

2006 U.S. Dist. LEXIS 33011; 2006 WL 1455464

SYLVESTER DZIENNIK, et al., Plaintiffs, - against - SEALIFT, INC., et al., Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Claim dismissed by *Dziennik v. Sealift, Inc., 2006 U.S. Dist. LEXIS 61860 (E.D.N.Y., Aug. 30, 2006)*

**Counsel:** [*1]  For Sylvester Dziennik, Mieczyslaw Kiersztyn, Ferdynand Kobierowski, individually and on behalf of all persons similarly situated, Plaintiffs: Ralph J. Mellusi, Tabak Mellusi & Shisha, New York, NY.

For Sealift Inc., Fortune Maritime, Inc., Sagamore Shipping, Inc., Sealift Chemicals, Inc., Victory Maritime, Inc., Sealift Tankships, Inc., Remington Shipping, Inc., Wilson Shipping, Inc., Defendants: Gordon S. Arnott, Hill, Betts & Nash LLP, New York, NY.

**Judges:** MARILYN D. GO, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** MARILYN D. GO

# Opinion

*ORDER*

GO, United States Magistrate Judge:

Plaintiffs, who are foreign nationals employed as seamen on certain vessels owned by defendants, bring this putative class action to recover, *inter alia,* full wages owed under employment contracts, collective bargaining agreements and/or various laws, including overtime wages and delay wages. This order addresses plaintiffs' motion to compel defendants to produce unredacted employment contracts for all putative plaintiffs (ct. doc. 22), and defendants' cross-motion for an order limiting communications between plaintiffs and their counsel and members of the putative class (ct. doc. 24).

*DISCUSSION*

[*2]  I. *Identifying Information of Putative Class Members*

Plaintiffs seek to compel production of unredacted employment contracts of putative plaintiffs, including their names and addresses. The defendants produced the documents in response to plaintiffs' discovery request for the "employment contracts of all persons who fell within the putative class description described by plaintiff." *See* ct. doc. 22, Exh. A. In their response, defendants produced two lists of seamen who fall within the putative class description without identifying information and sample employment contracts pertaining to each list, but with all identifying information redacted. *See id.,* Exh. B. Plaintiffs argue that the redacted information is necessary to verify defendants' other discovery responses which are incomplete.

A party may obtain discovery of any non-privileged matter that is relevant to a claim or defense of any party. *Fed. R. Civ. P. 26(b)(1).* Nevertheless, "discovery, like all matters of procedure, has ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978).* In *Oppenheimer,* the Supreme [*3]  Court held that the production of class members' names was not "within the scope of legitimate discovery." *437 U.S. at 354* (ordering production of names and addresses under *Rule 23* for notice purposes where class was certified). Although the Court acknowledged that it did "not hold that class members' names and addresses never can be obtained under the discovery rules," those instances are limited to issues relevant to class certification such as numerosity or where contact with members of the class could yield information relevant to issues in the case. *See id. at 351 n.13, 354 n.20.*

Courts have ordinarily refused to allow discovery of class members' identities at the pre-certification stage out of concern that plaintiffs' attorneys may be seeking such information to identify potential new clients, rather than to establish the appropriateness of certification. *See, e.g.,*

*Hatch v. Reliance Ins. Co., 758 F.2d 409, 416 (9th Cir. 1985)* (affirming denial of motion to produce names of similarly situated investors); *In re Mortgagors of Temple-Inland Mortg. Corp., 2001 U.S. Dist. LEXIS 1918, No. Civ. A. 99-CV-4633, 2001 WL 177181, at *2 (E.D. Pa. Jan. 24, 2001)*; [*4] *Buycks-Roberson v. Citibank Federal Sav. Bank, 162 F.R.D. 338, 342 (N.D. Ill. 1995)* (in redlining action against bank, plaintiffs were not entitled to loan files without redacted addresses where loan applicant's names were also redacted); *Flanigan v. Am. Fin. Sys. of Ga., 72 F.R.D. 563, 563 (M.D. Ga. 1976)* ("Rule 23 should not be used as a device to enable client solicitation"); *Crabtree v. Hayden, Stone Inc., 43 F.R.D. 281, 283 (S.D.N.Y. 1967)* ("the purpose of the pre-trial discovery rules . . . is to enable the parties to prepare for trial with respect to their own bona fide existing claims, not to determine whether third parties may have similar claims"); *but see Wiginton v. CB Richard Ellis, Inc., 2003 U.S. Dist. LEXIS 16266, No. 02 C 6832, 2003 WL 22232907, at *4 (N.D. Ill. Sept. 16, 2003)* (ordering defendant to produce list of female employees in sexual harassment action).

All but one of the cases cited by plaintiff involve claims under the Fair Labor Standards Act ("FLSA") or the Age Discrimination in Employment Act ("ADEA") which have different procedures for potential class members to opt in to any collective action brought. *See Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)* [*5] (ADEA); *United States v. Cook, 795 F.2d 987 (2d Cir. 1986)* (FLSA); *Patton v. Thomson Corp., 364 F. Supp. 2d 263 (E.D.N.Y. 2005)* (FLSA); *Whitworth v. Chiles Offshore Corp., 1992 U.S. Dist. LEXIS 17844, No. Civ. A 921505, 1992 WL 365153 (E.D. La. Nov. 25, 1992)* (FLSA). Those cases are easily distinguishable because the limitations period continues to run until the potential class member opts in, giving rise to a need to identify and provide notice to potential class members promptly. *See In re Mortgagors, 2001 U.S. Dist. LEXIS 1918, 2001 WL 177181, at *2.*

Plaintiffs claim the information is necessary to verify defendants' discovery responses since defendants have provided false information on several occasions regarding the number of putative plaintiffs. For example, plaintiffs note that defendants' discovery response lists only one foreign seaman that was employed in 2006 while plaintiffs claim they have independently identified at least 24 foreign seafarers that have been employed on Sealift vessels in 2006. *See* ct. doc. 22 at 5. However, as defendants point out, plaintiffs' discovery request only covered the putative class period, from January 1, 1999 until September 28, 2005.

[*6] *See* ct. doc. 24 at 6; ct. doc. 22, Exh. A. Therefore, defendants' response may not necessarily be incomplete or inaccurate as to seamen employed in 2006.

Plaintiffs further point to the deposition testimony of James Hannon, crewing manager of Sealift, in a related case, *Felskowski v. Sealift,* 04-CV-1244, that 8 to 10 Polish seafarers were hired in 2004 for the entire Sealift fleet while defendants' discovery response lists at least 35 Polish seafarers employed in 2004. *See* ct. doc. 22 at 6, Exh. B. Without the benefit of Mr. Hannon's deposition transcript, it is impossible for the Court to draw any conclusion about the consistency of Mr. Hannon's testimony with defendants' discovery responses. [1]

On this record, plaintiffs have not demonstrated the relevance of the information they seek beyond their argument that the names are necessary [*7] to verify defendants' responses. Plaintiffs already have sufficient information to identify the number of putative class members for class certification purposes. Thus, plaintiffs' application is denied without prejudice to a future application should circumstances warrant.

## II. *Restrictions on Communications Between Plaintiffs' Counsel and Members of the Putative Class and Sealift Employees*

Defendants seek an order restricting communications between plaintiffs and their counsel and any members of the putative class. In support, defendants submit two emails they argue demonstrate that plaintiffs have engaged in improper communications with members of the putative class. One email is from a Polish fitter advising that he had received phone calls from a representative of a company called "P and I Services Navigator" pressuring him to sign a power of attorney to participate in a case against defendant Sealift and asking for the addresses of others with whom he had worked. *See* ct. doc. 24 at 7-8. Another email submitted by defendant is from the captain of a Sealift vessel reporting that several members of his crew or their families were contacted by attorneys. *See id.* [*8] at 9-10. The wife of one crew member was advised by these attorneys not to contact a crewing agent used by defendants and that defendants would not hire them anymore Filipinos. *See id.* at 3, 10. One of the emails indicates that some of the people contacted were confused as to whether those contacting them were Sealift's attorneys. *See id.* at 10.

*Fed. R. Civ. P. 23(d)* authorizes the court to regulate communications with putative class members even before

---

1  Plaintiffs' other allegations regarding Sealift's attempts to deceive the United States Coast Guard are unsupported by any evidence submitted with their application.

certification. *See Fed. R. Civ. P. 23(d)*; *see also Keystone Tobacco Co., Inc. v. U.S. Tobacco Co., 238 F. Supp. 2d 151, 154 (D.D.C. 2002)* ("[T]he Court rejects defendants' position that it has no authority to limit communications between litigants and putative class members prior to class certification"); *Ralph Oldsmobile, Inc. v. GMC, 2001 U.S. Dist. LEXIS 13893, No. 99 Civ. 4567, 2001 WL 1035132, at *2 (S.D.N.Y. Sept. 7, 2001).* "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel [*9] and parties." *Gulf Oil v. Bernard, 452 U.S. 89, 100, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981).* However, judicial intervention is justified only where there is "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id. at 101-02.* Such intervention "should result in a carefully drawn order that limits speech as little as possible consistent with the rights of the parties under the circumstances." *Id.*

"Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *In re School Asbestos Litig., 842 F.2d 671, 683 (3d Cir. 1988).* "[A] district court's authority under *Rule 23(d)* is not limited to communications that actually mislead or otherwise threaten to create confusion, but extends to communications that interfere with the proper administration of a class action or those that abuse the rights of members of the class." *In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005).* [*10]

Here, defendants have failed to establish that plaintiffs are engaged in any abusive or unethical communications with absent class members. As a preliminary matter, plaintiffs generally have a right to contact members of the putative class. *See Williams v. Chartwell Financial Servs., Ltd., 204 F.3d 748, 759 (7th Cir. 2000).* Plaintiffs' counsel maintains that the contact was made by investigators who have been instructed to identify for whom they work and that the information sought pertains solely to employment on board Sealift vessels. I find that the vague emails submitted by defendants are insufficient to support findings of need for a limitation that would outweigh the class members' rights. "[T]he mere possibility of abuses does not justify routine

adoption of a communications ban that interferes with the formation of a class or the prosecution of a class action in accordance with the Rules." *Gulf Oil, 452 U.S. at 104.*

Defendants also seek an order regulating contact between plaintiffs and their counsel and any Sealift employees. *See* ct. doc. 24 at 5. Disciplinary Rule 7-104(A)(1) prohibits an attorney from communicating with a party that [*11] is represented by another attorney. With regard to employees of a corporate entity, an employee "should be considered a party within the meaning of DR 7-104(A)(1), either because: (1) he/she had high-level managerial responsibility and was capable of binding the corporation; (2) his/her acts or omissions may be imputed to the corporation for purposes of civil or criminal liability; or (3) his/her statements may constitute an admission." *Pauling v. Sec'y of the DOI, 1997 U.S. Dist. LEXIS 16333, No. 95 Civ. 8408, 1997 WL 661393, at *1 (S.D.N.Y. Oct. 22, 1997)* (quoting *Miano v. AC & R Advertising, 148 F.R.D. 68, 76-77 (S.D.N.Y.), aff'd, 834 F. Supp. 632 (S.D.N.Y. 1993)*).

Thus, there is no support for defendants' request that plaintiffs and their counsel be prohibited from communications with "any Sealift employee." Moreover, since plaintiffs themselves are not attorneys, professional ethical restrictions do not apply to them. [2] *See Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs., 2004 U.S. Dist. LEXIS 3503, No. 02 Civ. 9151, 2004 WL 421789, at *1 (S.D.N.Y. March 5, 2004).*

[*12] CONCLUSION

For the foregoing reasons, plaintiffs' motion to compel is denied and defendants' motion for a protective order is denied.

**SO ORDERED.**

Dated: Brooklyn, New York

May 23, 2006

/s/

MARILYN D. GO

UNITED STATES MAGISTRATE JUDGE

---

[2]   On the other hand, "an attorney cannot circumvent Disciplinary Rules by requesting or engineering an action be taken by another that, if performed by the lawyer, would violate the Disciplinary Rules." *Realuyo v. Diaz, 2006 U.S. Dist. LEXIS 11420, No. 98 Civ. 7684, 2006 WL 695683, at *12 (S.D.N.Y. March 17, 2006).*



# *Excess Ins. Co., Ltd. v. Rochdale Ins. Co.*

United States District Court for the Southern District of New York

October 3, 2007, Decided; October 4, 2007, Filed

05 Civ. 10174(RWS)

**Reporter**
2007 U.S. Dist. LEXIS 74193; 2007 WL 2900217

EXCESS INSURANCE COMPANY, LTD. Plaintiff, -against- ROCHDALE INSURANCE COMPANY, and AMTRUST FINANCIAL GROUP, Defendants.

**Counsel:** [*1] For Plaintiff: CAMERON BANFIL LLP, New York, NY. By: Lawrence W. Rose, Esq.

For Defendants: HARGRAVES McCONNELL & COSTIGAN, P.C., New York, NY. By: Daniel A. Hargraves, Esq., Andrew J. Costigan, Esq.

**Judges:** ROBERT W. SWEET U.S.D.J.

**Opinion by:** ROBERT W. SWEET

# Opinion

MEMORANDUM OPINION

**Sweet, D.J.**

Plaintiff Excess Insurance Company Ltd. ("Excess" or the "Plaintiff") moved by letter motion to compel defendants Rochdale Insurance Company and Amtrust Financial Group ("Rochdale" or the "Defendants") to produce documents in this reinsurance litigation. Rochdale cross moved to compel Excess to produce documents.

Excess and Rochdale have submitted affidavits to the effect that all the requested documents other than the Rochdale filings with regulatory agencies which request Rochdale contends is overly broad. The parties did not meet and confer concerning the document requests but agreed to submit the motion and cross motion on July 11, 2007.

Prior to filing a motion to compel, a party must have "in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action . . . ." *Fed. R. Civ. P. 37(a)(2)(B)*. The meet-and-confer [*2] requirement mandates that parties actually "meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining . . . what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention." *Prescient Partners. L.P. v. Fieldcrest Cannon, Inc., 1998 U.S. Dist. LEXIS 1826, 1998 WL 67672 at *3 (S.D.N.Y. Feb. 18, 1998)* (quoting *Deckon v. Chidebere, 1994 U.S. Dist. LEXIS 12778, 1994 WL 49488 at *5 (S.D.N.Y. Sept. 9, 1994))*.

Courts have excused a failure to meet and confer in situations where to do so would be clearly futile, *Matsushita Elec. Corp. of Am. v. 212 Copiers Corp., 1996 U.S. Dist. LEXIS 2221, 1996 WL 87245 at *3 (S.D.N.Y. Feb. 29, 1996)*, or exigent time constraints mandate immediate action, *In re NASDAQ Market-Makers Antitrust Litigation, 1996 U.S. Dist. LEXIS 4969, 1996 WL 187409 at *2 (S.D.N.Y. Apr. 18, 1996)*.

The purpose of the meet and confer requirement is to resolve discovery matters without the court's intervention to the greatest extent possible. Only those matters that remain unresolved after serious attempts to reach agreement should be the subject of a motion to compel. Here, the record [*3] indicates that the meet and confer requirement of *Fed. R. Civ. P. 37(a)(2)(B)* was not met. Mere correspondence, absent exigent circumstances not present here, does not satisfy the requirement. See *Prescient Partners, 1998 U.S. Dist. LEXIS 1826, 1998 WL 67672 at *3*.

The motion and cross motions are denied on the representations that the requests have been complied with. Leave is granted to move for any further relief after meeting and conferring.

The request for regulatory filings is denied as overly broad. Any further requests will result in a meeting and conference between counsel.

A pretrial conference will be held at the parties' earliest convenience to be scheduled with the Deputy Clerk.

2007 U.S. Dist. LEXIS 74193, *3

It is so ordered.                                        ROBERT W. SWEET U.S.D.J.

New York, NY

October 3, 2007



# Harris v. comScore, Inc.

United States District Court for the Northern District of Illinois, Eastern Division

March 2, 2012, Decided; March 2, 2012, Filed

Case No. 11 CV 5807

**Reporter**
2012 U.S. Dist. LEXIS 27665; 2012 WL 686709

MIKE HARRIS and JEFF DUNSTAN, individually and on behalf of a class of similarly situated individuals, Plaintiffs, v. COMSCORE, Inc., a Delaware Corporation, Defendant.

**Subsequent History:** Class certification granted by, in part, Class certification denied by, in part *Harris v. comScore, Inc., 2013 U.S. Dist. LEXIS 47399 (N.D. Ill., Apr. 2, 2013)*

**Prior History:** *Harris v. comScore, Inc., 825 F. Supp. 2d 924, 2011 U.S. Dist. LEXIS 115988 (N.D. Ill., 2011)*

**Counsel:** [*1] For Jeff Dunstan, individually and on behalf of a class of simiarly situated individuals, Mike Harris, Plaintiffs: Jay Edelson, LEAD ATTORNEY, Chandler Randolph Givens, Steven W. Teppler, Edelson McGuire, LLC, Chicago, IL; William Charles Gray, LEAD ATTORNEY, Chicago, IL; Ari Jonathan Scharg, Rafey S. Balabanian, Edelson McGuire LLC, Chicago, IL.

For comScore, Inc., a Delaware corporation, Defendant: Andrew H. Schapiro, LEAD ATTORNEY, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL; Michael G Rhodes, LEAD ATTORNEY, PRO HAC VICE, Cooley LLP, San Francisco, CA; Amanda S. Williamson, Emanuel Urquhart & Sullivan LLP, Chicago, IL; David Zev Smith, Leonard Ernest Hudson, Reed Smith LLP, Chicago, IL; Mark William Wallin, Paul F. Stack, Stack & O'Connor Chartered, Chicago, IL; Ray A. Sardo, PRO HAC VICE, Cooley Llp, San Francisco, CA; Stephen A. Swedlow, Quinn Emanuel, Chicago, IL; Whitty Somvichian, PRO HAC VICE, Cooley Godward Kronish LLP, San Francisco, CA.

**Judges:** Young B. Kim, United States Magistrate Judge.

**Opinion by:** Young B. Kim

# Opinion

**MEMORANDUM OPINION and ORDER**

In this putative class action, Plaintiffs Mike Harris and Jeff Dunstan allege that comScore, Inc. ("comScore") improperly collected and disseminated [*2] personal information belonging to them and a class of similarly situated individuals. They claim that comScore violated the Stored Communications Act, *18 U.S.C. § 2701(a)(1)* and *(2)*, the Electronic Communications Privacy Act, *18 U.S.C. § 2511(1)(a)* and *(d)*, the Computer Fraud and Abuse Act, *18 U.S.C. § 1030(a)(2)(C)*, the Illinois Consumer Fraud and Deceptive Practices Act, *815 Ill. Comp. Stat. Ann. 505/1* (2007), and was unjustly enriched by its actions. This matter is before the court on the motion of comScore to bifurcate discovery into two phases—the first relating to class certification, and the second relating to the merits—and to stay discovery on the merits until further order of the court. For the following reasons, the motion is granted:

**Facts and Procedural History**

Plaintiffs allege that comScore, an Internet market research company, induces individuals to download and install its software by "bundling" it with free items such as screensavers, games, and third-party computer applications like CD burning software or greeting card templates. (R. 1, Compl. ¶¶ 13, 33.) After a user installs the comScore software, the software surreptitiously collects information about the user's [*3] online activity, scans some of the user's computer files, and transmits the information to comScore's servers. (Id. at ¶¶ 5, 9.) comScore then aggregates the data it mines from the individual users for the purpose of developing market research reports, which it sells to its clients. (Id. at ¶ 25.)

Plaintiffs allege that they, as well as a class of similarly situated individuals, were misled by comScore's Terms of Service ("ToS"). (Id. at ¶ 37.) They allege that in some cases, comScore's ToS display screens do not refer to comScore's full license agreement (id. at ¶ 38), and in other cases, do not adequately alert consumers to a link containing comScore's license agreement (id. at ¶ 40). They further allege that comScore's ToS and Privacy Policy are

incomplete because they fail to disclose pertinent information such as the types of modifications that the comScore software will make to the user's computer settings, the breadth of personal data that the software will collect from the user's computer, and the possibility that the installation of the software will result in comScore scanning files on computers found on the user's local networks. (Id. at ¶¶ 7, 10, 11, 37, 51.) Moreover, Plaintiffs [*4] allege that the comScore software, once installed, is difficult to remove. (Id. at ¶¶ 57, 58.)

Approximately two million internet users have installed comScore's software. (Id. at ¶¶ 31, 67, 70.) Harris alleges that when he downloaded a free screensaver, he unwittingly installed comScore's software, but did not agree to comScore's ToS or understand that the screensaver was bundled with comScore's software. (Id. at ¶¶ 67-69.) Harris alleges that he was able to uninstall the comScore software from his Macintosh computer but only after "conducting hours of diligent research." (Id. at ¶ 68.) Dunstan alleges that when he downloaded a free greeting card template it was secretly bundled with comScore's software. (Id. at ¶ 70.) Dunstan alleges that his computer, which ran the Windows operating system, was "debilitated" by the comScore software. (Id. at ¶¶ 70, 71.) Dunstan alleges that he had to purchase and use a $40 anti-virus software to remove the comScore software and restore his computer's functionality. (Id. at ¶ 73.)

Pursuant to _Federal Rules of Civil Procedure 23(b)(2)_ and _(b)(3)_, Plaintiffs brought this action on behalf of themselves and all other persons similarly situated. They seek [*5] to represent a class consisting of "all individuals and entities in the United States that have had comScore's surveillance software ("Surveillance Software") installed on their computer(s) and a Subclass of all individuals and entities in the United States that have incurred costs in removing the Surveillance Software." (R. 2, Pls.' Mot. to Certify Class at 2.)

Harris [1] propounded his first set of interrogatories and document requests to comScore in December 2011. (R. 67-1, 67-2.) comScore characterizes these requests as "sweeping and intrusive . . . encompassing virtually all aspects of comScore's business." (R. 67, Def.'s Mem. in Support of Bifurcation at 1.) comScore seeks to delay responding to these requests except as they relate to class certification issues. (Id. at 11.) To that end, comScore has agreed to respond to the interrogatories and requests for production that it believes relate to class certification issues. It has already produced the source code for the software in dispute, including the source code for its "RK Verify" software, which comScore describes as the software "that confirms that consumers have viewed and agreed to comScore's Terms of Service before installing [*6] the software." (Id. at 2.)

**Analysis**

comScore argues that it would be inefficient and wasteful to conduct merits discovery before the assigned District Judge rules on the pending class certification motion. comScore predicts that if class certification is denied, Plaintiffs will settle or voluntarily withdraw their complaint because the statutory damages at issue—maximum $1,000 for Harris and $1,040 for Dunstan—are meager. In that event, any merits discovery already performed would be a wasted, expensive effort. If, on the other hand, the court certifies a class or classes, the certification order will clarify the issues to be litigated on the merits and will thereby narrow the scope of merits discovery. comScore suggests that the court might certify a class limited to Macintosh users or limited to Windows users because the comScore software for the two operating systems differs for at least two reasons: (1) comScore sold the data it collected from Windows users, but not the data collected from Macintosh users (_see_ R. 59, Ans. at ¶ 38); [*7] and (2) comScore's software for Windows did not authorize data collection from local networks, though its software for Macintosh did allow limited connection to computers networked with its Macintosh users (_see_ id. ¶ 10). comScore suggests that if the court certifies a class limited to either group of users, discovery on the merits relating to the other group would be rendered irrelevant and wasteful.

Plaintiffs disagree. They argue that bifurcated discovery will delay the litigation. They are particularly sensitive to any delay induced by comScore because of comScore's repeated praise of the "rocket docket" of Virginia, its preferred venue. Secondly, they argue that bifurcation will require increased judicial supervision because the parties will disagree about the permissible scope of class certification discovery. Third, they argue that comScore has not met its burden of establishing "good cause" for a protective order delaying merits discovery.

"The Federal Rules of Civil Procedure give magistrate judges broad discretion in resolving discovery disputes."

---

[1]   The record does not explain why Dunstan's name does not appear on the written requests for discovery but this ruling applies to all parties in this case.

*Heyman v. Beatrice Co., Inc., No. 89 C 7381, 1992 U.S. Dist. LEXIS 14298, 1992 WL 245682, at *2 (N.D. Ill. Sept. 23, 1992)*. That discretion extends to decisions [*8] to bifurcate discovery. See *Ocean Atlantic Woodland Corp. v. DRH Cambridge Homes, Inc., No. 02 C 2523, 2004 U.S. Dist. LEXIS 4698, 2004 WL 609326, at *2 (N.D. Ill. March 23, 2004)* ("[w]hether to bifurcate discovery is a matter committed to the discretion of the trial court"). Though the Federal Rules of Civil Procedure do not explicitly provide for bifurcated discovery, the 2003 Advisory Committee Notes to *Rule 23* recognize that bifurcation is often appropriate: "it is appropriate to conduct controlled discovery . . . limited to those aspects relevant to making the certification decision on an informed basis." *Fed. R. Civ. P. 23* Advisory Committee's Notes. In deciding motions to bifurcate merits discovery from class certification discovery, courts consider the following factors: (1) expediency, meaning whether bifurcated discovery will aid the court in making a timely determination on the class certification motion, *see Plummer v. Chicago Journeyman Plumbers' Local Union No. 130, U.A., 77 F.R.D. 399, 402 (N.D. Ill. 1977)*; (2) economy, meaning "the potential impact a grant or denial of certification would have upon the pending litigation," *see Gonzalez v. Pepsico, Inc., No. 06-2163-KHV, 2007 U.S. Dist. LEXIS 27279, 2007 WL 1100204, at *3 (D. Kan. April 11, 2007)*, [*9] and whether the definition of the class would "help determine the limits of discovery on the merits," *see American Nurses' Assoc. v. State of Illinois, 1986 U.S. Dist. LEXIS 20447, 1986 WL 10382, at *3 (N.D. Ill. Sept. 12, 1986)*; and (3) severability, meaning whether class certification and merits issues are closely enmeshed, *see Gray v. First Winthrop Corp., 133 F.R.D. 39, 41 (N.D. Cal. 1990)*.

An evaluation of these factors leads to the conclusion that bifurcation of discovery is the more sensible approach to discovery in this particular case. Proceeding with merits discovery, which may well involve the review of millions of documents not directly relevant to the issues of class certification, may delay the parties' submission of supplemental briefing on the class certification issue. Any delay would frustrate the court's effort to certify the action as a class action "[a]t an early practicable time," as is mandated by *Rule 23(c)(1)(A)*. For this reason, the Manual for Complex Litigation counsels that "[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary." Manual for Complex Litigation (Fourth) § 21.14 (2011). Regarding this expediency concern, Plaintiffs do [*10] not address whether bifurcation will result in a speedier determination of the class certification issue, but rather counter that bifurcation will significantly delay the resolution on the merits. This argument fails because bifurcated discovery will not take significantly more time than would non-bifurcated discovery. The parties' report of their *Rule 26(f)* planning meeting specifies that non-bifurcated discovery should take 10 months. (R. 60, Report of the Pty.'s Planning Meeting at 3.) This is approximately the same total length of time as comScore envisions for bifurcated discovery, excluding the pause while the assigned District Judge considers the fully-briefed class certification motion—a required pause before reaching the merits of the case. Moreover, if a class is certified, the definition of "that class should help determine the limits of discovery on the merits," *American Nurses' Assoc., 1986 U.S. Dist. LEXIS 20447, 1986 WL 10382 at *3*, which will save time as the parties move forward with the litigation. Overall, the potential for a modest delay in reaching resolution on the merits does not outweigh the court's obligation under *Rule 23(c)* to resolve the class certification issue "at an early practicable [*11] time."

Secondly, considerations of economy weigh in favor of bifurcating discovery in this case. As comScore points out, the limited statutory damages available to Plaintiffs are likely an insufficient motivation to litigate in the absence of class certification. Notably, Plaintiffs do not argue that they would pursue the merits as individual plaintiffs. Instead, they argue that economy is not an appropriate consideration before the court. (R. 70, Pls.' Resp. at 7.) Two treatises disagree with Plaintiffs on this point. According to the Manual for Complex Litigation, "in cases that are unlikely to continue if not certified, discovery into aspects of the merits unrelated to certification . . . can create extraordinary and unnecessary expense and burden." Manual for Complex Litigation at § 21.14. Similarly, McLauchlin on Class Actions summarizes that "[c]ourts are more likely to decline requests to stay pure merits discovery when the nature of the putative representative's claims suggests that it would continue to prosecute individual claims if certification is denied," which suggests that courts are indeed more likely to grant requests to stay merits discovery when the nature of the putative [*12] representative's claims indicates that the claimant would *not* pursue their claims if certification is denied. *See* McLauchlin on Class Actions (Eighth) § 3:10 (2011). In this case, bifurcation of discovery will be economical not only if certification is denied, but also if it is approved. As discussed above, if comScore's averments about the differences between its Macintosh and Windows software are borne out by discovery, the court might certify a limited class. Waiting until the court has made that determination may avoid needless discovery into issues that are ultimately not relevant to the litigation.

The final factor—the severability of class certification issues from merits issues—also points towards bifurcation

2012 U.S. Dist. LEXIS 27665, *12

of discovery. Though the ″boundary between a class determination and the merits may not always be easily discernible,″ *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A., 657 F.2d 890, 895 (7th Cir. 1981)*, it is possible to draw general lines in this case. Discovery relevant to class certification will focus on the prerequisites for class actions provided by *Rule 23(a)*: (1) numerosity of party plaintiffs; (2) commonality of questions of law and fact; (3) [*13] typicality of the representative parties' claims and defenses to those of the class; and (4) adequacy of representation. *Fed. R. Civ. P. 23(a)*. Regarding numerosity, the inquiry is whether ″a class approach would be useful to avoid the practical problems of trying to join many named plaintiffs or otherwise clog the docket with numerous individual suits,″ *Eggleston, 657 F.2d at 895*, so certification discovery will seek to determine the approximate number of potential members of the class. Regarding commonality, the inquiry is whether ″there appear to be common questions of law or fact.″ *Id.* Here, the commonality prong will likely turn on whether the putative class members' consent, and the scope of consent, is subject to evaluation on a class-wide basis, and whether comScore's adherence to the scope of consent is subject to analysis on a class-wide basis. The third prong, typicality, ″requires a showing, not unrelated to commonality, that others suffer from similar alleged grievances″ of Plaintiffs. *Id. at 896*. Here, the typicality prong will turn on whether Harris' and Dunstan's alleged experiences downloading and removing the comScore software are similar to those of the putative [*14] class. Lastly, the adequacy prong asks whether ″the named parties are qualified and capable of fully pursuing the common goals of the class without collusion or conflicts of interests.″ *Id*.

In this case, the following issues are not relevant to the class certification analysis because they do not touch on any of the four prongs of *Rule 23(a)*: (1) the development of the comScore software; (2) internal comScore emails; (3) comScore's relationships with its bundling partners (excluding comScore's agreements with bundling partners to obtain consent from prospective comScore users); and (4) comScore's relationships with its clients. To the extent that class certification matters are tightly intertwined with merits discovery, comScore must produce the information and/or documents requested so that Plaintiffs may develop their

arguments relevant to class certification. While Plaintiffs are likely correct that bifurcation will result in more active judicial supervision, that alone is not sufficient to deny comScore's motion.

Turning now to the specific interrogatories and requests for production currently at issue, this court concludes that comScore must answer the following requests as they [*15] pertain to the certification issues: (1) Interrogatories 1-5, 11 (with limitation), 15-17, and 22; and (2) Requests for Production (″RFP″) 1. [2] Interrogatories 1-5 and RFP 1 seek general information about comScore's process of answering interrogatories and RFPs. comScore must respond to these requests to the extent they relate to the Interrogatories and RFPs that comScore has agreed to answer and is ordered to answer.

Interrogatory 11 seeks discovery about the types of data that third-party entities purchased, specified by the purchasers. Plaintiffs argue that this discovery is necessary to establish ″whether the class members suffered damages and, if so, whether such damages predominate . . . or are incidental.″ (R. 70, Pls.' Resp. at 10.) This court agrees that whether the members of the proposed classes suffered [*16] similar damages is relevant to the issue of commonality, and further agrees that whether comScore sold similar types of panelist data is relevant to the issue of whether comScore's alleged breach of the putative class members' scope of consent is subject to evaluation on a class-wide basis. But, the identities of comScore's clients are not relevant to the class certification analysis. Defendant is ordered to answer this interrogatory without having to identify the third-party purchasers.

Interrogatory 15 seeks information about comScore's source code control and source code library retention policies and practices. comScore argues that the source code it has agreed to produce to Plaintiffs will allow them to ″test their core allegations on the merits while also addressing the central issues on class certification.″ (R. 67, Def.'s Mem. in Support of Bifurcation at 2.) But the information sought by Interrogatory 15 may be necessary to assess the integrity of comScore's source code.

Interrogatories 16 and 17 [3] ask comScore to identify and describe each type of information that the comScore software ″monitors, collects, retains, and/or transmits″ from the

---

[2]   comScore has agreed to respond to Interrogatories 6-8, and 12-14, and Requests for Production 2, 13, 15, 18, 21-26, 34, 35, and 40-42. (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n.5 and 11 n.6.) The parties have also agreed to a process for addressing Interrogatory 23 and RFP 43, which relate to expert reports and discovery. (Id. at 15 and R. 70, Pls.' Resp. at 13 n.5.)

[3]   According to comScore, its commitment to produce the relevant source code ″addresses Plaintiffs' Requests for Production Nos. 2, 27-28, and Interrogatories 16 and 17.″ (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n.5.) This court disagrees in regards to Interrogatories 16 and 17. While the source code would likely enable Plaintiffs to access the information sought by Interrogatories 16

Windows and Macintosh panelists. [*17] Whether comScore collected the same, or substantially the same, types of content from the panelists is relevant to the commonality prong of the class certification analysis. Interrogatory 22 seeks factual information relating to comScore's position that class certification is inappropriate in this case. This interrogatory clearly seeks information directly related to the class certification issues.

The remaining interrogatories (9, 10 and 18-21) and RFPs (3-12, 14, 16, 17, 19, 20, 29-33, 36-39 and 44-45) are outside the scope of class certification discovery and [*18] are stayed pending resolution of the class certification issues. Interrogatories 9 and 18 and RFPs 4, 9-12, 31-33, and 37, seek discovery about comScore's "bundling partners" and its "Trees for the Future" program. comScore's bundling partners are the entities that offer comScore's software in conjunction with their own free software applications. (R. 1, Compl. at ¶ 13.) comScore's Trees for the Future program induces Internet users to become panelists in exchange for having trees planted. (R. 70, Pls.' Resp. at 12.) comScore's relationships with third-parties are not relevant to the issues of numerosity, commonality, typicality, and adequacy of representation. To the extent that Plaintiffs believe that responses to these Interrogatories and RFPs would address issues of consent for the panelists who obtained the comScore software through a bundling partner or the Trees for the Future program, they are unnecessary because comScore has already agreed to produce that information in response to Interrogatories 13 and 14 and RFPs 15 and 24-26. (R. 67, Def.'s Mem. in Support of Bifurcation at 11 n.6.) Plaintiffs will also be able to explore comScore's methods of obtaining consent from prospective [*19] panelists by examining the source code and RK Verify software.

Interrogatory 10 seeks discovery about the purchasers of comScore's market research data. Plaintiffs argue that this discovery is necessary to establish "whether the class members suffered damages and, if so, whether such damages predominate . . . or are incidental." (R. 70, Pls.' Resp. at 10.) As stated earlier this court agrees that whether the members of the proposed classes suffered similar damages is relevant to the issue of commonality but the identities of comScore's clients are not relevant to the certification analysis.

Interrogatory 19 and RFP 8 seek information related to comScore's investigation and termination of its Macintosh panel. Plaintiffs argue that they need this discovery to establish whether injunctive relief is appropriate. But these requests are overly broad for that purpose. For example, Interrogatory 19 requests that comScore describe its "investigation of the MAC PANEL, INCLUDING the reasons for its ultimate termination, and IDENTIFY ALL DOCUMENTS RELATING TO such investigation." Similarly, RFP 8 requests all documents and ESI relating to the investigation and termination of the Macintosh panel. [*20] How comScore investigated its Macintosh panel and its reasons for terminating it are not relevant to the appropriateness of injunctive relief in this case. If Plaintiffs need discovery to verify comScore's termination of the Macintosh panel, they should propound a more limited request to that end.

Interrogatory 20 and RFP 44 seek discovery about comScore's public relations response to the litigation. comScore's efforts to manage its public relations are not relevant to the _Rule 23_ prerequisites for class certification. Interrogatory 21, which seeks discovery about comScore's affirmative defenses, goes to the merits and is not relevant to class certification.

RFPs 3, 5-7, and 14 seek information about comScore's development of its software. This request is unduly burdensome and unlikely to yield discovery relevant to the certification issues. The members of the putative class were not impacted by the development of comScore's software, but by the software itself.

RFPs 16, 17, 19, 20, 28, [4] 36, and 38 seek communications between comScore and its employees on a variety of topics. At this stage in the litigation, Plaintiffs need to establish that comScore's software impacted the putative [*21] class members in a common manner. comScore's internal communications are less relevant to that issue than how the software actually impacted the putative class. Plaintiffs have access to the source code, which, in conjunction with the discovery responses mandated in this order, should demonstrate how the software impacted the members of the putative class.

---

and 17, Plaintiffs suggest that having to "go fish" through the code is burdensome. (R. 70, Pls.' Resp. at 14.) Because Interrogatories 16 and 17 clearly relate to class certification issues, Plaintiffs are entitled to that discovery now.

[4]   According to comScore, its commitment to produce the relevant source code "addresses Plaintiffs' Requests for Production . . . 27-28." (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n.5.) Because RFP 28 also requests communications between comScore and its employees, the source code is not responsive.

2012 U.S. Dist. LEXIS 27665, *21

RFPs 27, [5] 29, and 30 seek documents, ESI, and communications relating to comScore's use and sale of information personal to Harris and other panelists. This court agrees with Plaintiffs that whether comScore sold similar types of personal information of other panelists is relevant to commonality, and whether comScore sold Harris's personal information is relevant to typicality. However, as framed, the scope of these requests are overly broad as they would include comScore's contracts and contract negotiations with its clients, [*22] neither of which is relevant to the *Rule 23* analysis. Furthermore, comScore's answer to Interrogatory 11 should provide Plaintiffs with information on the types of personal data comScore sold to others.

RFP 45, which seeks information about comScore's liability insurance, is also not relevant to the class certification issues. However, based on the parties' joint statement in their Report of the Parties' Planning Meeting, comScore should have produced a copy of the relevant policies on December 7, 2011, pursuant to *Federal Rule of Civil Procedure 26(a)(1)(A)(iv)*. [6] (R. 60 at 1.)

**Conclusion**

For  [*23] the foregoing reasons, comScore's motion to bifurcate discovery is granted. Discovery on the merits is stayed until after the court rules on Plaintiffs' motion to certify the action as a class action. comScore is ordered to respond to the written discovery requests as detailed herein by March 23, 2012.

**ENTER:**

/s/ Young B. Kim

**Young B. Kim**

**United States Magistrate Judge**

---

[5]   According to comScore, its commitment to produce the relevant source code ″addresses Plaintiffs' Requests for Production . . . 27-28.″ (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n.5.) In fact, RFP 27 requests documents and ESI relating to agreements between comScore and the panelists. The source code, alone, is therefore not responsive to RFP 27.

[6]   Because the parties have not provided the court with substantive arguments regarding RFP 39, the court is unable to determine whether this request is relevant to the class certification or merits issues. The parties should meet and confer in regard to RFP 39.



## *Jones v. Goord*

United States District Court for the Southern District of New York

May 15, 2002, Decided ; May 16, 2002, Filed

95 Civ. 8026 (GEL)

**Reporter**
2002 U.S. Dist. LEXIS 8707; 2002 WL 1007614

DAVID JONES, ISSAC NELSON, KEVIN MARTIN, WILLIAM MEACHEM, CLARENCE SUBER, TOBIAS WALLS, HENRY MORENO, JAMES WHITE, RAMON BLAS, ANGELO CARAVAGGIO, ROY DAVIS, LUCIANO ORTIZ, RORY DOLAN, LIBERATO BERMUDEZ, GREGORY SMITH, FRUITQUAN BAILEY, TODD BROCKINGTON, RENALDO RIVERA, JAMES DIXON, JUAN PERDOMO, HERBERT JUNIOR, HECTOR LOPEZ, JUAN RIVERA, DWAYNE FAUST, and all others similarly situated, Plaintiffs, -v- GLENN S. GOORD, Acting Commissioner of the New York State Department of Correctional Services, EDMUND WUTZER, Chairperson of the New York State Commission of Correction, THOMAS J. GOLDRICK, Commissioner of the State Commission of Correction, FLOYD BENNETT, Superintendent of Elmira Correctional Facility, HANS WALKER, Superintendent of Auburn Correctional Facility, ROBERT H. KUHLMANN, Superintendent of Sullivan Correctional Facility, DAVID MILLER, Superintendent of Eastern Correctional Facility and CHRISTOPHER ARTUZ, Superintendent of Green Haven Correctional Facility, Defendants.

**Subsequent History:** Claim dismissed by *Jones v. Goord, 2006 U.S. Dist. LEXIS 34835 (S.D.N.Y., May 26, 2006)*

**Prior History:** *Jones v. Goord, 2000 U.S. Dist. LEXIS 3377 (S.D.N.Y., Mar. 15, 2000)*

**Disposition:** [*1] Motion to compel production denied.

**Counsel:** Ira S. Sacks (Stephane Clare, Midwin Charles, on the brief), Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for David Jones, Plaintiff.

Barbara Demchuk Maddox, Barbara K. Hathaway, Steven N. Schulman, Assistant Attorneys General of the State of New York, (Eliot Spitzer, Attorney General of the State of New York, on the brief), New York, NY, for Glenn S. Goord, Defendant.

**Judges:** GERARD E. LYNCH, United States District Judge.

**Opinion by:** GERARD E. LYNCH

# Opinion

### *OPINION AND ORDER*

GERARD E. LYNCH, District Judge:

Broad discovery is a cornerstone of the litigation process contemplated by the Federal Rules of Civil Procedure. Particularly in institutional reform litigation, the ability of citizen complainants to obtain access to governmental records, in order to present the courts with a full and accurate picture of the inner workings of public institutions, is a vital safeguard of fairness in litigation and of constitutional rights. The motion before the court, in which inmate plaintiffs seek access to various electronic databases maintained by state correctional authorities, tests the limits of this salutary practice. Because plaintiffs' [*2] demands exceed those limits, the motion will be denied.

### I. *The Litigation*

This is a class action in which plaintiffs challenge New York State's administration of a program for double-celling in its maximum-security prisons. Double-celling is a practice by which, due to overcrowding, two prisoners are housed in a cell originally designed for one person. It is clearly established that double-celling, even in maximum security prisons, does not in itself constitute cruel and unusual punishment in violation of the *Eighth Amendment*. *Rhodes v. Chapman, 452 U.S. 337, 339, 349-50, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981)*. Plaintiffs nevertheless contend that in actual practice, the manner in which double-celling is carried out in New York violates the Constitution, because the increases in disease transmission and violence occasioned by the practice result in "depriving inmates of the minimal civilized measure of life's necessities," *id. at 347*, and

demonstrate that the New York authorities have been deliberately indifferent to the health and safety of inmates in their charge. *See Wilson v. Seiter, 501 U.S. 294, 303-05, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991)*. [*3]

This litigation has a long history. The complaint was filed in 1995, making it one of the oldest active cases on this Court's docket, and the case has been assigned to several judges over the years. The case was effectively stayed for a considerable period pending litigation of a companion case challenging the same practice in medium-security prisons. After a full trial on the merits, Judge Stein denied the plaintiffs in that case any relief, in a lengthy and careful opinion. *Bolton v. Goord, 992 F. Supp. 604 (S.D.N.Y. 1998)*.

As the outcome of the *Bolton* case showed, plaintiffs here face a difficult burden. Under the Supreme Court's precedents, it is not enough for plaintiffs to prove that double-celling is overall less comfortable, or even less conducive to health and safety, than a policy of "one man, one cell." It would be surprising indeed if packing prisoners, particularly ones assigned to maximum-security institutions, in closer proximity, did not result in more incidents of inmate illness or injury than would otherwise occur. But, as *Chapman* shows, the former one-inmate-to-a-cell policy does not represent a constitutional baseline, any more than maintaining [*4] that policy would have placed conditions in New York's prisons beyond constitutional question. Without doubt, the more the state spends on security and health, the better off the inmates will be, and it could always be argued that the failure to spend more results in harms to inmates that in principle could have been avoided by the allocation of additional resources. The problem for a court is not to enforce its idea of an ideal prison budget, but to decide when economies in prison spending create conditions that cannot be tolerated in a humane society. The plaintiffs' contention that New York's policy oversteps this line faces the further obstacle that double-celling is not a universal or even widespread condition in New York's prisons. It appears to be undisputed that the practice affects fewer than 5% of New York's maximum-security cells, and that inmates are housed in such cells for no more than 60 days at a time.

II. *Discovery*

Against this background, the parties have toiled in discovery for several years. Active discovery resumed after the *Bolton* trial in early 1998. Since then, pursuant to an agreement to concentrate discovery on a "sample" of only four of the [*5] State's thirteen maximum-security prisons, the State has provided to plaintiffs over 700,000 pages of documents, many of which have needed to be carefully reviewed and redacted prior to disclosure, at enormous expense. Among the categories of documents disclosed have been the forms prepared to determine which inmates are to be double-celled, inmate grievance reports, use of force reports, "unusual incident reports," and lists of inmates diagnosed with various diseases. There is no evidence that the State has resisted plaintiffs' demands for documents, or unreasonably refused to produce any records that have been sought.

Shortly after the case was reassigned to me in September 2000, the Court convened a conference to address the status of discovery in this then-already-aged case. It was represented to the Court at that conference, in early October 2000, that document discovery would be concluded by January 2001, and it was ordered that all fact discovery end by March 31, 2001. As often occurs, sometimes despite the best efforts of counsel, this deadline was not met, and in early March the parties contacted chambers to advise that depositions were behind schedule and that an extension [*6] of the deadline would be required. On March 23, 2001, the Court entered an order extending the discovery deadline to December 31, 2001, and providing that there would be no further extensions. As will shortly be seen, subsequent events led to further extensions, and the discovery deadline is now set for May 24, 2002.

III. *The Electronic Database Request*

In August 2001, after nearly six years of litigation, plaintiffs for the first time specifically sought the production of electronic records and databases. Plaintiffs argue that the electronic data they seek was properly within the scope of discovery demands for inmate data served years before. Assuming for the sake of the argument that some or all of the requested databases came within the literal terms of broad document demands served by the plaintiffs, however, it ignores the practicalities of complex discovery, and the specific history of this case, to contend that the August 2001 request was merely a reminder that the State's production in response to earlier demands was still incomplete. Plaintiffs acknowledge that they have been aware of the existence of at least some of the databases in question during testimony [*7] in the *Bolton* trial in 1997. By the time of plaintiffs' August 2001 letter, the parties had been engaged in active discovery for at least three years. Various discovery disputes had been presented to me and to previous judges assigned to the case. As noted above, in October 2000 the plaintiffs agreed in open court that they hoped to be through with document discovery in just a few months. On none of these occasions was there any indication that plaintiffs considered the State derelict in failing to produce electronic records. Indeed, plaintiffs point out no reference to discovery

of electronic data in the court record or in correspondence between the parties prior to the August 2001 demand.

The State, in turn, was slow to respond, only objecting to the demand in November 2001. When the matter was called to the Court's attention, a pre-motion conference was promptly scheduled, and a briefing schedule set for a motion to compel production. (At the same time, the Court reluctantly granted yet another extension of the fact discovery cut-off, again threatening that further extensions would be denied.) Both sides eventually sought extensions on that briefing schedule. The Court, perhaps [*8] overly solicitous of counsel's needs, granted the extensions, and the matter was finally fully briefed on April 26, 2002. In the process, one very last extension of the fact discovery cut-off was granted, to May 24, 2002.

IV. *The Parties' Positions*

A. *Plaintiffs' Motion*

Plaintiffs request the production of six different electronic databases. Although both sides have filed their submissions under seal due to the sensitive nature of some of the materials involved, no security concerns prevent public disclosure of the nature of these databases. No one would be surprised to learn that the prison system maintains computerized records that enable them (1) to track the location of prisoners in the system; (2) and (3) to record and recover unusual incident reports and disciplinary records; and (4), (5) and (6) to monitor prisoners' medical problems, including scheduling of medical appointments, tracking prisoners with certain specific medical problems, and recording the pharmaceuticals required by prisoners. Plaintiffs have demanded to be provided with copies of these databases.

Plaintiffs argue that this is a simple and straightforward discovery demand, of a sort routinely [*9] enforceable under the Federal Rules. Plaintiffs' complaint argues that double-celling produces intolerable health and safety risks to them. Information about which prisoners have been double-celled (and where and when), and the extent of disciplinary problems, violent incidents, and medical problems in the prisons is clearly relevant to testing that claim. Plaintiffs point out that at the *Bolton* trial, the State offered expert testimony about the correlation between double-celling and various problems that was derived, in part, from information contained in these databases. Plaintiffs claim that they should have the same opportunity to analyze the data for themselves, to see whether information in the State's records supports their claims.

In fact, plaintiffs go farther than arguing relevance. They insist that the databases are "*essential* to the effective prosecution of Plaintiffs' claims." (Pl. Br. at 2, emphasis added.) "Without the Databases, Plaintiffs *cannot* effectively demonstrate the unconstitutional impact of double celling." (*Id*. at 9, emphasis added.) The argument is that without sophisticated statistical analysis of the incidence of disease and violence [*10] vis-a-vis double-celling, individual testimony will be dismissed as anecdotal, and plaintiffs will fail to establish that double-celling causes extensive and systematic harm. Plaintiffs propose to undertake "an iterative process in which a statistical expert must identify a set of independent variables related to characteristics of double celling," and then test the data for "relationships with any number of dependent variables, . . . [including] incidents of violence, misbehavior, the severity of violence and misbehavior, incidence of infectious diseases among the inmate population, . . . etc." (*Id*. at 9-10.) The process of identifying correlations and performing regression analyses on these variables is not a simple matter of "running a test. Different combinations must be analyzed. After each analysis, the statisticians and counsel must review the results, and propose revised analyses to be run. . . . The scope of the project is substantial: the number of potential statistical relationships is in the millions." (*Id*. at 10-11.)

Plaintiffs go on to anticipate and rebut the State's objections to production. (1) To the extent that the State is concerned about security of [*11] information, plaintiffs contend that existing confidentiality orders can adequately protect the security of the information; further, they offer additional safeguards, such as limiting access to the copied data. Moreover, they point out that much of the data contained in the electronic databases (though not all) is already available to the plaintiffs in hard copy, so that the additional security risk is slight. (2) To the extent that the State argues that plaintiffs already have the necessary information, plaintiffs argue that the electronic data are both more extensive and more easily manipulable, permitting more efficient analysis of the evidence, and that requiring the plaintiffs to create their own electronic database will impose extraordinary burdens on plaintiffs' pro bono counsel. (3) To the extent that the State claims production of the databases will be unduly burdensome, plaintiffs point out that the data is already backed up on a routine basis, and that replication of an additional copy for plaintiffs on the occasion of such a data back-up should be relatively simple.

Notably, however, plaintiffs' assertions about the kinds of analyses they wish to perform, the security [*12] issues involved, and the practicalities of reproducing the material and utilizing it for the desired purposes are supported only

Page 3 of 12

by affidavits from counsel. Plaintiffs provide no evidentiary support from any statistical expert concerning the kinds of hypotheses that could be tested by data of the nature contained in the databases, or what statistical methodology might produce reliable results. Nor do they offer an affidavit from any information technology expert who has considered the descriptions of the databases obtained in depositions, who can testify to the ease with which such data, once copied, can be integrated into a form that will permit whatever statistical manipulations are contemplated, or to how the data could be maintained in a secure manner. Indeed, it is apparent from an examination of plaintiffs' motion that plaintiffs have not retained any such experts yet, and are engaging for the most part in (somewhat informed) speculation about what might be done with the data they seek.

### B. *Defendants' Response*

The State objects that the databases at issue should not be ordered produced. *First*, defendants denigrate the merits of plaintiffs' claims, arguing that plaintiffs [*13] are pursuing chimerical claims with little or no chance of success. *Second*, they argue that the databases are not useful in the manner plaintiffs suggest, (1) because the data contained in them are already available to plaintiffs in hard copy form, previously produced to them at great public expense, and (2) because the databases involved, constructed for different purposes using different software and user interfaces for different users within the corrections bureaucracy, cannot simply be downloaded and massaged as easily as plaintiffs claim.

*Third*, defendants argue that reproduction of the databases, contrary to plaintiffs' submission, would in fact be a burdensome and technically complex task, since, in order to be usable, the data would not merely have to be copied, but also would have to be accompanied by extensive technical commentary and decoding to permit any unfamiliar user to understand the systems, integrate the different databases involved, and extract from them data in a form that could facilitate the comparisons and statistical tests contemplated by plaintiffs. *Fourth*, they argue that the data in question are subject at least to a qualified privilege, in [*14] that they contain confidential personal data about employees and prisoners (including many who are not members of the plaintiff class).

*Fifth* and finally, they argue that neither the existing protective order nor the additional measures proposed by plaintiffs nor any conceivable protective devices ordered by the Court could adequately deal with the security concerns

presented by the databases. It is argued (1) that the very structure of the databases, and the necessary technical specifications that would have to accompany them in order to permit plaintiffs' experts to make any productive use of them, would disclose features of the correctional computer systems that (if disseminated) would render the State's systems more vulnerable to hacking; (2) that, although much of the information contained in the databases has already been made available in hard copy, information in electronic form is far easier to steal and transmit than the extensive paper records already in plaintiffs' hands; (3) that information (for example, matters relating to staff) not relevant to the case, redacted from prior document discovery, and contained in the databases, could not practically be redacted from [*15] the databases and would create risks to the physical security and privacy of guards and other staff.

In contrast to plaintiffs' motion papers, the State's submission includes detailed affidavits from officials familiar with and responsible for the construction and use of the databases. These affidavits contain significant technical details relating to at least some of the practical utilization and security issues relevant to disposition of the motion.

Incredibly, in the face of this voluminous and detailed response, plaintiffs' reply papers decline to join further issue with the State's factual contentions. While the Court appreciates any moving party's decision not to burden the Court with repetitive papers raking over the same ground as previous submissions, plaintiffs' cavalier dismissal of the State's well-supported factual presentation as a mere example of "protesting too much" (Pl. Reply at 1) that raises no matters not already adequately disposed of in the moving papers, rings more of empty bravado than of calm confidence.

### V. *The Legal Framework*

The discovery permitted by the Federal Rules is broad, but not without limits. As an initial matter, "Parties may obtain [*16] discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." *Fed. R. Civ. P. 26(b)(1)*. However, discovery is subject to limitation by the Court to the extent that

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the records sought; or (iii) the burden or expense of the proposed discovery

outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

_Fed. R. Civ. P. 26(b)(2)_. In addition, where necessary "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," the Court may enter any protective order that is necessary, including "that the disclosure or discovery not be had." _Fed. R. Civ. P. 26(c)(1)_. "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly. [*17] _Crawford-El v. Britton, 523 U.S. 574, 598, 140 L. Ed. 2d 759, 118 S. Ct. 1584 (1998)_.

Thus, the first step in the process is deciding whether requested material is discoverable, that is, whether it is relevant and not privileged. If it is, the Court still has considerable discretion to evaluate the practical realities of discovery, balancing the importance of the information against the burdens of production to decide whether fairness does or does not require production, and if so, on what terms.

This framework applies to requests for electronic or computer-based information just as it applies to more traditional materials. 8A Charles Alan Wright & Arthur R. Miller, _Federal Practice and Procedure_, § 2218 at 451 (2d ed. 1994). As electronic mechanisms for storing and retrieving data have become more common, it has increasingly behooved courts and counsel to become familiar with such methods, and to develop expertise and procedures for incorporating "electronic discovery" into the familiar rituals of litigation. The rules cited above, albeit for the most part drafted in an earlier era, deal perfectly well with the problems occasioned-by discovery of electronic [*18] "documents." At the same time, that the principles applied are the same does not mean that any information that would be discoverable in paper form must automatically be discoverable, on the same terms and conditions, and without consideration of additional issues, in electronic form -- or, for that matter, that material that could not be discovered in hard copy would not be discoverable in the form of a database. Particularly when it comes to balancing the costs and benefits of providing discovery, the balance may well differ depending on the form of the information. In this case, for example, the plaintiffs claim that the same information produced in hard copy will be more valuable in the form of an electronic database, because the information will be more manipulable. The State, on the other hand, claims that the burdens and risks of producing electronic

data will be much greater than those of producing the same information in the form of paper documents and reports. Such claims must be carefully evaluated on a case-by-case basis. Without at this point accepting either side's claims, it is evident that the form of the data requested creates special problems that must be given appropriate [*19] consideration.

VI. _The Framework Applied_

A. _Discoverability_

1. _Relevance_

It is evident that the material requested is, at least for the most part, relevant to the plaintiffs' claims. Plaintiffs contend that the State's double-celling program, as it has actually been conducted, leads to unacceptable increases in the amount of disease and violence in the State's maximum-security prisons. To test this hypothesis (one might prefer to say, "to prove this case," but the plaintiffs' own submissions -- that it will be impossible to prove their case without subjecting evidence that they have not yet obtained to statistical manipulations they cannot yet specify by experts they have not yet identified -- strongly imply that they are engaged in speculation rather than proof), it would clearly be helpful to be able to identify which prisoners have been located in two-inmate cells during which periods, and to correlate that information with medical and incident reports. The databases in question, which relate to the location of prisoners, the incidence of medical problems and pharmaceutical use, and the extent of disciplinary incidents of various kinds, are generally relevant [*20] to that inquiry. The State, indeed, does not directly challenge the claim that the material sought is relevant, within the meaning of _Rule 26(b)(1)_.

At the same time, it is far from clear from the evidence presented that all of the information in the databases sought goes to these issues. Plaintiffs have not established that the databases are limited to class members, or that they are or could be (without enormous effort and expense) redacted to relate only to maximum-security inmates. So far as the record before the Court indicates, in fact, the opposite is true. That is, the databases appear to be general DOCS managerial tools, covering all inmates in the State correctional system. Nothing in the record suggests that the databases are easily broken down in such a way that only the portion relating to the institutions involved in this lawsuit can be separately reproduced or disclosed.

Moreover, the databases by their nature disclose more than the data that is in them. By producing the electronic material

in raw form, the State would disclose not only the underlying data sought by the plaintiffs, but also the organizational framework of the databases, which would effectively disclose [*21] a great deal about the way that DOCS maintains, stores, and classifies information. Worse, as will be discussed further below, the State asserts, and backs up its claim with expert testimony, that this disclosure would not be merely the passive result of providing the database. In order to enable any statistical use of the data, the State would have to affirmatively develop and provide to plaintiffs' experts the equivalent of a manual on how the data is encoded and organized. The burden of doing so will be addressed below; for now it is sufficient to note that as a practical matter the plaintiffs' demands of necessity include the production of information that is not strictly speaking relevant to the case. For purposes of this motion, however, it will be assumed that the databases, or at least a substantial part of the information contained in them, is relevant to the issues in this case.

## 2. Privilege

While the State does not contest the relevance of the material, it does argue that the databases are privileged. (Def. Br. at 13-19.) The claim is that because production of the databases would raise issues of prison security, the material is subject to a qualified privilege. But [*22] defendants' claim that "courts have recognized at least qualified privileges in prison personnel and inmate files" (Def. Br. at 14) is somewhat overstated. Courts are generally and appropriately reluctant to create new privileges, since evidentiary privileges are exceptions to the general rules of disclosure and admissibility of evidence that favor seeking the truth and promoting uniformity and simplicity in the law. *See Trammel v. United States, 445 U.S. 40, 50, 63 L. Ed. 2d 186, 100 S. Ct. 906 (1980)* (citing *United States v. Bryan, 339 U.S. 323, 331, 94 L. Ed. 884, 70 S. Ct. 724 (1950)); Gonzales v. National Broadcasting Co., 155 F.3d 618, 623-24 (2d Cir. 1998)*; 3 Jack B. Weinstein and Margaret Berger, *Weinstein's Federal Evidence, § 501.02[2][c]* at 501-15 (2d ed. 2002). Evidentiary privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth. *United States v. Nixon, 418 U.S. 683, 710, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974)*. As such, they must be strictly construed and accepted only to the very limited extent that . . . excluding relevant evidence has [*23] a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel, 445 U.S. at 50* (citation omitted).

Accordingly, this Court has examined carefully the precedents relied on by the State, to see whether the

privilege for which it contends has been recognized as within "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." *Fed. R. Evid. 501*. This examination discloses that the State considerably overstates its authority, which do not support the conclusion that a broad privilege for prison personnel records has been established.

The State cites *Kerr v. United States District Court, 426 U.S. 394, 405, 48 L. Ed. 2d 725, 96 S. Ct. 2119 (1976)*, implying that in that case the Supreme Court recognized a privilege, "which 'rest[s] in large part on the notion that turning over the requested documents would result in substantial injury to the State's prison-parole system.' (Def. Br. at 14, quoting *Kerr, 426 U.S. at 405*). But *Kerr* does not create such a privilege. The quoted text, in context, simply [*24] describes the basis for the California prison authorities' "claims of privilege." *Id.* The Court in *Kerr* refused to grant mandamus overturning a district court's disclosure order; while the Court noted with favor that the lower courts had not foreclosed an in camera review of the materials to determine whether privileged material was contained in the files, it certainly did not create, recognize or define any specific privilege in "prison personnel and inmate files," and instead appears to have left open whether there was any basis for invoking the "official or state secret privilege," which was apparently the only privilege asserted in the case. *Id. at 399*, citing *United States v. Reynolds, 345 U.S. 1, 97 L. Ed. 727, 73 S. Ct. 528 (1953)*.

The other case relied on by defendants, *Association for Reduction of Violence v. Hall, 734 F.2d 63, 66 (1st Cir. 1984)*, is no more availing, and is also misleadingly cited by the State. The First Circuit in *Hall* did not recognize any general privilege in prison files, nor did it even pass on any claim of privilege at all. *Hall* holds that the district court erred in relying on [*25] documents it had reviewed in camera, but withheld from the plaintiff on grounds of privilege, in deciding a summary judgment motion. With respect to the merits of the privilege determination, the court merely "assumed, without deciding, that the district court did not abuse its discretion in ruling that the documents it viewed in camera were privileged" under one or more of the well-established privileges covering the identities of informants, law enforcement techniques, and intragovernmental policy-making memoranda. *Id.* Thus, even the district court's reasoning, which the Court of Appeals expressly did not adopt as its own, did not purport to create a general privilege for "prison personnel and inmate files," but simply found that particular documents were not discoverable because they contained specific information privileged under these other categories.

Thus, the authorities relied on by the defendants do not establish the sweeping general privilege for which they contend. Rather, they support the less dramatic and unsurprising proposition that prison records are sensitive materials, which can be expected to contain a number of different types of information that potentially [*26] fall within several more traditional, carefully-defined privileges. Deciding whether the databases requested are privileged, or, more plausibly, contain some quantity of privileged information, would require more careful legal analysis than the parties have yet provided, including most likely some in camera inspection of the records, and a consideration of whether any privileges have been waived by the extensive disclosures already made by the defendants, which they themselves assert already contain substantial amounts of the data in the contested electronic databases.

Fortunately, it is not necessary in this case to decide whether the databases are, or contain material that is, within any of these privileges, or whether this Court should recognize the more general privilege claimed by the State as justified by "wisdom and experience." Defendants themselves claim no more than a qualified privilege, which may be overcome by a showing of need. But, as discussed below, even assuming for the sake of the argument that no privilege exists, and that the burden falls not on the plaintiffs to show special need, but on the defendants to establish that presumptively discoverable material nevertheless [*27] should be denied under the provisions of _Fed. R. Civ. P. 26(b)(2)_ and _26(c)_, the balance of benefit and burden clearly supports denying the plaintiffs' motion to compel disclosure of the databases. Though this inquiry in many ways parallels the privilege analysis, it is preferable to address the question under the case-specific, balancing test of the discovery rule, without making unnecessary broad legal proclamations about privilege.

## B. _Balancing the Burdens and Benefits of Discovery_

All three of the reasons set forth in _Rule 26(b)(2)_ as rationales for limiting disclosure of otherwise-discoverable information apply in this case and require denying discovery of the databases.

The most important reason for this conclusion, foreshadowed by defendants' claim of privilege, is that set forth in _Rule 26(b)(2)(iii)_: "the burden or expense of the proposed discovery outweighs its likely benefit taking into account the needs of the case, the amount in controversy, the parties resources the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Indeed, as will be seen, this standard largely subsumes the other considerations [*28] reflected in _Rules 26(b)(2)(i)_ and _(ii)_.

## 1. _Burden_

The State has demonstrated that the burden of the proposed discovery is extremely serious. In ordinary commercial litigation, the "burden" to be considered is primarily the economic cost of locating, reviewing, redacting, and reproducing requested files. Contrary to plaintiffs' claims, defendants have demonstrated that these burdens are not insignificant for the requested databases. Presumably, the actual data files could be reproduced quickly and without excessive labor on the part of DOCS's information technology specialists. But the expert affidavits supplied by defendants, and uncontradicted by any evidence offered by plaintiffs, persuasively establish that such a production of a few CD-ROMs would be of no utility to plaintiffs. Because the databases were designed for the operational purposes of prison administrators, the data desired by plaintiffs, while perhaps present in the databases, are not readily available for the statistical manipulations proposed by plaintiffs. (Martin Aff. PP 3A, 11.) Thus, the databases in question are not simply collections of lists or numbers that can be easily extracted and correlated with [*29] other numbers; rather, each of the requested databases has "been constructed to support the interactions of hundreds of concurrent users rather than to support the analytical activities of a few." (_Id. P 4_.) Consequently, the databases are integrally connected to a data system that comprises "25 separate but interdependent subsystems that each are comprised of scores of programs, tens of databases and scores of screen and report formats. There are over 3,000 programs containing a total of 1,500,000 lines of program instructions." (_Id._)

To take just one illustrative example, plaintiffs have requested the database[] supporting the Unusual Incident System." (Pl. Br. at 1) The Assistant Director of the Bureau of Management Information Systems in DOCS describes that system as follows:

> The Unusual Incident System was developed over fifteen years ago to replace and augment telephone and written notification to Central Office of any prison incident of an unusual nature. Data entry screens are used in the prison to record the description of the incident, the events causing the incident, the action taken, and a medical report. [This report is finalized and supplemented over [*30] time as additional information is received.] At each stage of the process, the system provides a rudimentary word processing capability to prepare

hard copy documents to certify and document the electronic record. This rudimentary word processing capability is vastly different than modern day word-processing functionality. . . . The content of an Unusual Incident "document" consists of many data fields and separate records for each line of narrative appearing on the report. When it is necessary to produce a hard copy document, a major program of the system reassembles all of the date, headings, captions and lines of narrative into a document such as those [already] provided to Plaintiff[s'] counsel. . . . The Unusual Incident system includes 36 programs, 21 screen formats and 48 reports available to the prisons or Central Office. The information in the Unusual Incident system is recorded in 8 database tables with a total of over 2,000,000 rows or records containing nearly 400,000,000 characters.

(Martin Aff. P 6.) This description is typical of those provided for the various other databases at issue on this motion. [1]

[*31] Thus, providing plaintiffs with any meaningful access to aspects of this system is not a matter of duplicating discs and handing over copies. The data that would presumably be useful to plaintiffs in analyzing patterns of disease and violence or correlating such patterns with double-celled inmates are not simply numbers maintained in a simple set of files that can be downloaded into some (unspecified) statistical analytic program and then crunched in some (unspecified) way to produce meaningful results. DOCS personnel would need to prepare extensive documentation of the structure of the programs and databases to enable any experts retained by plaintiffs to understand the layout of the data, the meaning of codes, and the sources from which those codes can be derived. (Martin Aff. PP 12-17.)

Again to take just one concrete example, when double-celling was instituted, it took DOCS officials nearly six months, and several person-months of effort, to develop from the Locator database requested by the plaintiffs a method to produce a supposedly accurate list of inmates who have been double-celled; since the data were apparently not

originally organized for purposes of tracking double-celling, [*32] which did not exist when the system began, it required the construction of additional programming tools to generate the list. DOCS experts estimate it would take eight weeks to prepare documentation of the Locator databases that would enable plaintiffs experts to recreate this effort to extract double-celling data in any form that would be usable for subsequent analysis. (This estimate does not, of course, account for whatever time it would take the experts to master that documentation.) (Martin Aff. P 12.) Ironically, the plaintiffs have already been provided with the fruit of this effort, in the form of the most recent iteration of the list of inmates who have been double-celled. Contrary to plaintiffs' assertions, the electronic data are not a more easily-manipulated electronic version of the list, but an infinitely more complex and embedded set of files from which the list can only be extracted (conceivably, given enough additional time, burden and expense, in a more manipulable form than a hard-copy list) with great difficulty.

The defendants estimate that the cost of the efforts required by plaintiffs' requests would be in excess of $ 100,000, not including the burden of disrupting [*33] DOCS operations by shifting expert computer personnel from operational duties. (Martin Aff. P 3.) Even taking the specific dollar figure with a large grain of salt, it is apparent that the financial burden on the State of complying with plaintiffs' demand would be significant.

But unlike the typical commercial litigation, the burden on defendants here is not limited to financial cost or business disruption. Production of the requested databases would have other negative consequences for the State that are even more significant. The security risks of producing the databases are substantial, and cannot be met by the mild and insufficiently thought-out measures suggested by plaintiffs.

It should go without saying that the data in question are highly sensitive. Only a handful of DOCS's own employees, and no one else, have access to the programs used to compile and store the data sought here. (Martin Aff. P 19) Access to the data themselves is more widely shared, but few DOCS officials have access to the totality of the

---

[1]   The one exception to this generalization is the (inmate) Pharmacy System. Unlike the various other requested databases, which form part of a complex integrated system, it is not clear that there even exists any "pharmacy system database" as requested by plaintiffs. Apparently the "system" here consists of a program purchased from a vendor and in use on stand-alone PCs at those prisons (not all) that have pharmacies, in order to keep track of prescriptions issued to inmates. The system is incomplete, insofar as prisons without pharmacies supply prisoners' pharmaceutical needs via outside vendor pharmacies, which keep their own records in whatever form they choose, which records in turn are not available to DOCS. Moreover, the records in the pharmacy "system" are not centrally integrated, and are accessible only to the pharmacists at each prison. The central office of DOCS "has never attempted to access data in the Pharmacy system," and its technical experts apparently have no idea how to do so. (Martin Aff. P 9.)

databases sought, which are used for different purposes and are accessed piecemeal rather than in their totality by prison officials. [2] [*35]  The requested databases contain [*34] confidential information about prison personnel; for example, unusual incident reports may contain identifying information (such as social security numbers) and medical information concerning prison staff. Pursuant to earlier court orders and confidentiality stipulations, such information has been painstakingly redacted, at considerable cost of time and effort, from hard-copy versions of these reports provided to plaintiffs. No program or other practicable automated method exists for redacting the computer records to remove the same information from any copy of the database provided to plaintiffs. (Martin Aff. P 20.) Accordingly, the alternatives available to the Court are either to order production of the unredacted database, dramatically ratcheting up the security burden of disclosure, or to order the production of a redacted version of the database, which would require a digital duplication of the extraordinary effort already undertaken with respect to the paper discovery process: a manual effort to input changes and corrections into the copied database to eliminate sensitive material. [3]

The databases also contain sensitive information that *has* been provided to plaintiffs, but in a different form. Here the particular characteristics of electronic information come into play in assessing the security costs of providing information in digital form. The costs and difficulties of redaction, for example, have earlier led the Court to permit production of documents with otherwise-confidential inmate medical information unredacted. The cost/benefit analysis with respect to hard-copy information has led to the conclusion that reasonable restrictions on access to and reproduction of documents are sufficient to prevent wholesale exposure of this information to unauthorized persons, particularly [*36]  as the authorized users were primarily members of the bar of this Court and their employees. While even the best security measures cannot prevent occasional regrettable leakage of particular documents, the difficulties attendant on the physical reproduction of hundreds of thousands of pages of material provide a de facto safeguard against massive theft or misuse of data.

But computer security is an entirely different matter. Plaintiffs' suggestions, including maintaining strict physical custody of discs or other storage media containing the requested data ignore the fact that the manipulation of the data projected by plaintiffs will require loading them into foreign computer systems, presumably belonging to as-yet-unselected experts who are neither subject to the licensing rules and ethical constraints imposed on members of the bar nor chosen for expertise in computer security. The ease with which entire databases can be reproduced or transmitted radically alters the security stakes and requires a rebalancing of the factors that permitted unredacted information to be disclosed in paper form. (Kirkpatrick Aff. P 6; Clark Aff.) Plaintiffs have provided no reports or affidavits from [*37]  anyone with expertise in computer security or database management that would provide any evidentiary basis for a conclusion that the data in question could be safeguarded by the means suggested by plaintiffs or by any other means.

Finally, production of the databases would present one other significant security concern not present in routine document discovery. Disclosure of the databases, and of the codes and documentation required to utilize them, would provide access not merely to the data themselves, but also to the techniques used by the prison authorities to record and store data. This is itself a highly confidential matter. In a business context, such disclosure would in some cases raise issues of the protection of trade secrets. *See, e.g., Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001-03, 81 L. Ed. 2d 815, 104 S. Ct. 2862 (1984)* (noting broad definition of trade secrets); *North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999)* (outlining defining factors of trade secrets); 3 *Weinstein's Federal Evidence, §§ 508.02-508.07*. In a prison context, the stakes are much higher. The security of the data in question against inmates [*38]  or their associates who have an incentive to seek access to DOCS computers is obviously an important concern. Disclosure of the underlying code and programming information presents a significant danger not presented by disclosure of the data content in hard-copy format. As defendants eloquently make the point, "You cannot hack into a computer printout, but a program can be a roadmap for hackers." (D. Br. at 16.)

2. Benefit

None of these concerns, significant as they are, necessarily preclude discovery. Security concerns can perhaps be met,

---

[2]   For example, inmate medical information contained in the medical databases requested by plaintiffs is not available to nonmedical personnel within DOCS. (Martin Aff. P 23.)

[3]   Personnel information is only one category of sensitive material contained in the database. The Locator database contains information, as the name suggests, detailing the cell location of every inmate in the system. That information, obviously confidential for security and other reasons, goes well beyond the listing of double-celled inmates already provided to plaintiffs. (Kirkpatrick Aff. P 9.)

with enough time, ingenuity, and expense; redaction can be accomplished, with the expenditure of sufficient resources. Parties to important public litigation or even private disputes sometimes have to bear significant costs in the discovery process, in order to assure fair and informed decision-making by courts. The "burden or expense of the proposed discovery," even when substantial, does not forbid disclosure. Rather, the rule asks whether that burden and expense "outweighs its likely benefits." *Fed. R. Civ. P. 26(b)(2)(iii)*. Accordingly, it is necessary to turn to the projected benefits of discovery to plaintiffs and to the truth-seeking process [*39] before determining whether disclosure can be had.

The suggested benefits, however, prove elusive. Plaintiffs make the plausible claim that having data in electronic, manipulable form will facilitate expert analysis of the data, and avoid the need for plaintiffs to incur significant expense -- which, as indigent inmates represented by pro bono counsel who have already expended significant resources on the case -- they can ill afford. But if this claim is facially appealing in the abstract, it is much more difficult to document and quantify any specific benefit sought by plaintiffs. As discussed above, the databases in question do not exist in a form that is susceptible to statistical analysis, and considerable time, effort and expense will be necessary to reduce them to a form that might be so usable, or to provide the background instructions and documentation that will permit them to be reduced to such form. Yet plaintiffs provide no meaningful account of what exactly they plan to do with the data. Other than very general statistical terms, such as "regression analysis," that offer little specific content, plaintiffs do not describe what they hope to find or how they hope to find [*40] it. Presumably, thinking through the actual uses of the databases is to be left to the as-yet-unselected experts who will one day be retained.

This puts the virtual cart before the digital horse. The Court cannot find that the major risks and burdens detailed above will be worth bearing on the basis of entirely speculative benefits. Of course, until an analysis is done, a court could never know whether that analysis will prove useful to plaintiffs, or produce proof of constitutional violations. But that is not the test; negative results could be as useful as positive ones to resolving this longstanding (long-*running* would be a misnomer) litigation. Though plaintiffs do not need to show that obtaining this data will in fact advance their cause, they do have to provide some basis to believe that specific tests can be run that, with a reasonable degree of scientific certainty, can be expected to yield results that would be relevant to the issues before the Court. *See, e.g., Waldron v. Cities Services Co., 361 F.2d 671, 673 (2d Cir. 1966)*. The case might be different if the plaintiffs proffered an affidavit from a reputable statistician explaining exactly

what hypotheses [*41] would be tested, on what theory and using which techniques, and precisely what data would be necessary to perform those tests. At a minimum, such an affidavit would enable defendants' computer experts to address whether and how the kind of data sought by the plaintiffs' statistics experts could be made available from DOCS's computers. On the present record, however, plaintiffs can only be characterized as demanding a huge volume of sensitive data, in a form that may or may not be usable for any productive purpose, on the vague hope that it will prove useful when subjected to future massage by unspecified experts. Plaintiffs, thus, have made little showing of "the importance of the proposed discovery in resolving the issues" before the Court. *Fed. R. Civ. P. 26(b)(2)(iii)*.

Finally, the benefits to be expected from the proposed discovery must be assessed in light of whether "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; [and] (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the records sought." *Fed. R. Civ. P. 26(b)(2)(i)*, [*42] *(ii)*. Though the Rule identifies these as separate grounds on which discovery may be limited, they may productively be considered as part of the burden/benefit analysis. Even if the discovery sought is not *so* cumulative that it can be dismissed out of hand on that ground alone, the extent to which the discovery is duplicative will bear importantly on the benefits to be expected from the discovery; even if the party cannot be said to have simply forfeited any claim to discovery by prior inaction, the extent to which a party has unreasonably foregone efforts to seek the discovery sought will affect both the burden on the opposing party and the evaluation of whether the party seeking discovery itself believes that significant benefits will accrue. These factors both weigh against compelling discovery in this case.

First, much of the actual *data* in the databases (to the extent relevant) has already been provided to plaintiffs in documentary form. Plaintiffs cite no concrete facts available in the database, relevant to the litigation, and unprivileged, that are not available in the 700,000 pages of material already provided to them. As repeatedly acknowledged in this opinion, the [*43] Court accepts the fact that the form of the databases sought could in theory provide non-cumulative value added to plaintiffs. At the same time, as also discussed above, the defendants are correct that the security burdens on the State will be massively increased by production in this form, such that it can readily be concluded that the document discovery already provided is far "less burdensome [and] less expensive" than the electronic

production now sought by plaintiffs.

Second, the expense of additional production has to be weighed in the context of the extraordinarily burdensome and expensive discovery process already undertaken in this case. Defendants have produced nearly three quarters of a million pages of records, and expended the months of personnel hours necessary to locate, prepare, redact, copy and ship those documents. This is no mere clerical task; the redaction process involves skilled work by attorneys and by paralegals and interns acting under their supervision. The Attorney General of New York has hired three full time clerks to work specifically on this case. (Moody Aff. P 2.) While the costs of employees on the public payroll are harder to estimate than the [*44] bills paid by litigants represented by lawyers who bill by the hour, the (largely hidden) burden on the public of the discovery process already conducted in this case is disturbing. Plaintiffs' counsel, too, has expended a significant amount of out-of-pocket costs on the case, as well as investing an enormous amount of (putatively very costly) attorney time.

This is relevant in assessing the cost of the requested discovery; that cost should not be assessed in isolation, but in the context of the total cost of discovery to date. It is also relevant to assessing whether the plaintiffs have had "ample opportunity" to obtain the information in question. As noted above, plaintiffs argue that discovery demands served early in this litigation could be construed as covering the databases that are the subject of this motion. But that claim ignores the realities of big-case discovery, which, perhaps unfortunately, often proceeds by the exchange of overbroad discovery demands and blanket objections, followed by concrete negotiations over what records are really necessary and what production the opposing party is really prepared to make without compulsion. Discovery in many cases is already burdened [*45] by posturing correspondence and excessive resort to court conferences that vastly increase the friction and cost of the process. Parties should be encouraged to work out differences amicably; for a court to ignore or fail to give effect to the informal accommodations and understandings that develop over time would undermine the spirit of cooperation and informality that alone makes effective discovery and settlement possible in overburdened courts.

Viewed against that realistic background, the record in this case makes absolutely clear that this discovery request is belated. The parties have spent years, significant sums, and exhaustive efforts on discovering and analyzing a mountain of paper -- a project that, plaintiffs now claim at the eleventh hour before expiration of the n-th discovery deadline, was

largely useless, or at least superseded, because the production of electronic data instead would have accomplished the same thing and more. Plaintiffs may not have identified the specific databases by name until a deposition in December 2001 laid out the details of the DOCS computer system, but they have been aware throughout discovery that DOCS, like any modern enterprise, keeps [*46] its records in computerized form. It is undisputed that reports devised from these very databases were introduced into evidence at the *Bolton* trial in 1997, and many of the reports and records that defendants have disclosed in hard-copy form have self-evidently been produced as printouts from computer files.

Nothing prevented plaintiffs from seeking, either informally through the extensive correspondence and telephonic communication between counsel, or formally by interrogatory, further information about the computer databases available from DOCS. Nothing prevented plaintiffs from discussing with their adversaries in a timely fashion, before the expenditure of hundreds of thousands of dollars on conventional document discovery, whether the mountain of paper was really necessary, or whether a cooperative effort to explore electronic discovery possibilities could have led to a mutually beneficial agreement. Nothing prevented plaintiffs from retaining experts to advise them as to what kinds of electronic data would likely be found in the DOCS computer system, what kinds of data would be necessary to evaluate plaintiffs' claims, and what kinds of security precautions could be presented [*47] to the State to satisfy its legitimate interests and induce agreement to cooperate in providing data. Nothing in the record suggests that any such efforts were made, or, indeed, that the plaintiffs took any step to seek discovery of any electronic data until after their adversaries had expended exorbitant sums of public money on conventional discovery, and until the ultimate deadline for completing fact discovery, after seven years of litigation, was at last at hand. Accordingly, the Court is constrained to find that the plaintiffs have had, and let pass, ample opportunity to obtain this information earlier in the discovery process, and that that conclusion strongly supports denying plaintiffs' motion.

## VII. *Conclusion*

The factual findings set forth in this opinion are largely uncontested. The State has compiled an impressive record documenting the technical issues involved in assessing the burdens and risks, and the obstacles to securing the hoped-for benefits, of ordering the discovery sought. Plaintiffs, as noted above, have blithely declined to respond to that presentation, relying on the facially plausible generalities

2002 U.S. Dist. LEXIS 8707, *47

put forth in their initial motion papers. The Court [*48] has nevertheless carefully and skeptically reviewed the papers submitted by defendants, only to find them ultimately persuasive and accurate.

Assuming for the sake of argument that the databases sought by plaintiffs are relevant and not privileged, the Court finds that discovery should be denied because defendants have made a compelling showing that the burden of the proposed discovery far outweighs its likely benefit for resolving the issues before the Court, particularly in light of the failure of the plaintiffs to seek such discovery despite ample opportunity to do so in a more timely manner, and the vast amount of material, largely duplicating the contents of the databases now sought, which has already been provided by the defendants. The Court will not impose additional burden, expense and risk of harm on the parties, and especially on the defendants, at this belated hour, after the expenditure of so much effort and expense, and on the undocumented hope of obtaining such speculative benefits.

The motion to compel production is denied.

SO ORDERED.

Dated: New York, New York

May 15, 2002

GERARD E. LYNCH

United States District Judge



# *Sithon Maritime Co. v. Holiday Mansion*

United States District Court for the District of Kansas

April 10, 1998, Decided ; April 10, 1998, Filed; April 10, 1998, Entered on the Docket

CIVIL ACTION No: 96-2262-EEO

**Reporter**
1998 U.S. Dist. LEXIS 5432

SITHON MARITIME COMPANY, Plaintiff, v. HOLIDAY MANSION, et al., Defendants.

**Notice:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**Disposition:** Plaintiff--Sithon Maritime Company's Motion to Compel Production of Documents by Defendant--Mercury Marine (doc. 119) sustained in part, deemed moot in part, and otherwise overruled.

**Counsel:** For SITHON MARITIME COMPANY, plaintiff: Lee M. Smithyman, Smithyman & Zakoura, Chtd., Overland Park, KS.

For SITHON MARITIME COMPANY, plaintiff: Michael G Chalos, Richard M Ziccardi, George J Tsimis, Chalos & Brown, New York, NY.

For HOLIDAY MANSION, defendant: Norman R. Kelly, Norton, Wasserman, Jones & Kelly, Salina, KS.

For MERCURY MARINE, defendant: Heather Suzanne Woodson, Stinson, Mag & Fizzell, P.C., Overland Park, KS.

For MERCURY MARINE, defendant: John C. Aisenbrey, Stinson, Mag & Fizzell, P.C., Kansas City, MO.

For MERCURY MARINE, defendant: Alex B Marconi, Patrick X Fowler, Snell & Wilmer L.L.P., Phoenix, AZ.

For MERCURY MARINE, cross-claimant: Heather Suzanne Woodson, Stinson, Mag & Fizzell, P.C., Overland Park, KS.

For MERCURY MARINE, cross-claimant: John C. Aisenbrey, Stinson, Mag & Fizzell, P.C., Kansas City, MO.

For MERCURY MARINE, cross-claimant: Alex B Marconi, Patrick X Fowler, Snell & Wilmer L.L.P., Phoenix, [*2] AZ.

For HOLIDAY MANSION, cross-defendant: Norman R. Kelly, Norton, Wasserman, Jones & Kelly, Salina, KS.

For MERCURY MARINE, counter-claimant: Heather Suzanne Woodson, Stinson, Mag & Fizzell, P.C., Overland Park, KS.

For MERCURY MARINE, counter-claimant: John C. Aisenbrey, Stinson, Mag & Fizzell, P.C., Kansas City, MO.

For MERCURY MARINE, counter-claimant: Alex B Marconi, Patrick X Fowler, Snell & Wilmer L.L.P., Phoenix, AZ.

For SITHON MARITIME COMPANY, counter-defendant: Lee M. Smithyman, Smithyman & Zakoura, Chtd., Overland Park, KS.

For SITHON MARITIME COMPANY, counter-defendant: Michael G Chalos, Richard M Ziccardi, George J Tsimis, Chalos & Brown, New York, NY.

For HOLIDAY MANSION, cross-claimant: Norman R. Kelly, Norton, Wasserman, Jones & Kelly, Salina, KS.

For MERCURY MARINE, cross-defendant: Heather Suzanne Woodson, Stinson, Mag & Fizzell, P.C., Overland Park, KS.

For MERCURY MARINE, cross-defendant: John C. Aisenbrey, Stinson, Mag & Fizzell, P.C., Kansas City, MO.

For MERCURY MARINE, cross-defendant: Alex B Marconi, Patrick X Fowler, Snell & Wilmer L.L.P., Phoenix, AZ.

For HOLIDAY MANSION, counter-claimant: Norman R. [*3] Kelly, Norton, Wasserman, Jones & Kelly, Salina, KS.

**Judges:** Gerald L. Rushfelt, United States Magistrate Judge.

**Opinion by:** Gerald L. Rushfelt

# Opinion

## MEMORANDUM AND ORDER

Before the court is Plaintiff--Sithon Maritime Company's Motion to Compel the Production of Documents by Defendant--Mercury Marine (doc. 119). Pursuant to *Fed. R. Civ. P. 26*, *34*, and *37(a)* and D.Kan. Rules 37.1 and 37.2, plaintiff seeks an order to compel defendant Mercury Marine (Mercury) to produce forthwith all documents responsive to Plaintiff's Second Request for Production of Documents (Second Request) and all documents requested in a letter dated June 3, 1997. It further seeks an order to compel Mercury to formally supplement its responses to the Second Request to include a description of the circumstances surrounding the destruction of certain materials as set forth in Section II(E) of the instructions in its Second Request, a categorization by Bates number of which documents respond to which request, and an amended privilege log for all responsive documents. It also seeks its costs and attorney fees incurred in making the present motion. Mercury opposes the motion. It requests its costs and attorney fees incurred [*4] in responding.

As a preliminary matter, Mercury suggests that plaintiff has not adequately identified the requests at issue. While the format chosen by plaintiff may not be the best, it nevertheless specifically places at issue every request in the Second Request and the letter of June 3, 1997. Both parties digress with discussion only tangentially related to the discovery dispute at issue. Much of the briefing addresses an alleged failure by Mercury to produce documents in response to a letter dated October 16, 1996. The court does not view production or its lack in response to the letter as an issue raised by the motion. It will concentrate its efforts instead on the Second Request of plaintiff and the letter of June 3, 1997. Counsel are directed in future briefing to address matters pertinent to their motions and not to unnecessary topics which waste the time of the court.

**Issues Regarding Letter of June 3, 1997**

Plaintiff asks the court to treat the letter of June 3, 1997, as a formal request for production of documents. It suggests that the materials requested therein merely reiterate or form a subset of its Second Request. It further suggests the letter forms part [*5] of its compliance with the conference requirements of the Federal Rules of Civil Procedure and the Rules of Practice of the United States District Court for the District of Kansas. To the extent the court considers items requested in the letter to be new requests apart from the Second Request, plaintiff explains that it made the request "in letter form because the May 7th deadline for serving document requests had passed." (Mem. in Supp., doc. 120, page 29.) It suggests that dilatory practices of Mercury necessitated the request in letter format. It contends that the letter would have been unnecessary, had Mercury responded in good faith to previous requests for documents. It urges the court to order Mercury to produce the items requested in the letter "in the interests of judicial efficiency and economy, and to preserve the current trial date and other deadlines set forth in this Court's Scheduling Order." (*Id.*)

Defendant contends that it has fully responded to each of the twenty-seven informal requests. It argues, furthermore, that the letter does not constitute a formal request for production pursuant to *Fed. R. Civ. P. 34*. It also notes that plaintiff filed its motion less [*6] than a month after making the informal requests.

The court will not consider the letter of June 3, 1997, as a formal request for production of documents. The Federal Rules of Civil Procedure provide necessary boundaries and requirements for formal discovery. Parties must comply with such requirements in order to resort to the provisions of *Fed. R. Civ. P. 37*, governing motions to compel. Informal requests for production lie outside the boundaries of the discovery rules. Formal requests may be filed under some circumstances, not letter requests. Formal requests require certificates of conferring and service. Letters do not. Formal requests certify representations of counsel under *Fed. R. Civ. P. 11(b)*. Letters do not. Formal requests clearly implicate the duties of opposing parties to respond, pursuant to *Fed. R. Civ. P. 34*. Letters do not. Formal requests may occasion sanctions. Letters usually do not. To treat correspondence between counsel as formal requests for production under *Rule 34* would create confusion and chaos in discovery. *Fed. R. Civ. P. 37(a)(2)(B)* permits a party to move to compel production of documents "if a party, in response to a request for inspection submitted [*7] under *Rule 34*, fails to respond." An evasive or incomplete response is a failure to respond, within the meaning of *Rule 37(a)(2)(B)*. *Fed. R. Civ. P. 37(a)(3)*.

*Fed. R. Civ. P. 34(a)* establishes the permissible scope of production. *Fed. R. Civ. P. 34(b)* establishes the procedure for submitting the request and for responding to it. The letter of June 3, 1997, does not meet the requirements of *Rule 34*. Plaintiff did not "serve" the letter upon Mercury as contemplated by the Rule. *See Fed. R. Civ. P. 34(a)*. The letter does not give Mercury thirty days in which to provide

a written response. *See Fed. R. Civ. P. 34(b)*. Plaintiff cannot properly move to compel production of documents sought in an informal letter requesting production. Although both informal investigation and formal discovery have their proper place in the litigation arena, the Federal Rules of Civil Procedure address only formal discovery. The court thus overrules the motion of plaintiff to the extent it seeks to compel further production in response to the letter of June 3, 1997.

The court finds the proffered reasons for considering the letter as a formal request unpersuasive. If it simply reiterates the documents **[*8]** requested in the Second Request, the letter constitutes an unnecessary redundancy. Consideration of the formal request suffices. That the letter forms a part of plaintiff's duty to confer also provides no justifiable reason to elevate the letter to the status of a formal request for production. The duty to confer arises after a dispute on a formal request for discovery. This duty provides no premise for expanding the scope of the original requests which prompted the need to confer; unless the parties agree to treat it so without the need for intervention of the court. The Federal Rules of Civil Procedure do not contemplate moving to compel items requested informally between parties. The weakness of the suggestion that the court consider the letter as a formal request "because" the deadline has otherwise passed is obvious. Accepting the strained reasoning of plaintiff would permit a party to disregard the deadline simply by an informal request. The court declines to disregard established deadlines in that fashion. Arguments about judicial efficiency and economy, trial date, and other deadlines, furthermore, have no persuasive quality. The court has indefinitely continued the date for **[*9]** trial. That other deadlines may expire or need revision provides no rational basis for transforming the letter into a formal request for production.

Were the court to construe the letter as a formal request for production made in accordance with *Fed. R. Civ. P. 34*, furthermore, it would overrule, as premature, the motion as it relates to the letter of June 3, 1997. *Rule 34(b)* grants a responding party thirty days after service of the request to serve written response. Plaintiff filed this motion before the thirty days elapsed.

**Global Issues Regarding Second Request for Production**

The Second Request contains thirty-nine separate requests for production of documents. Mercury claims to have fully responded to them. It nevertheless indicates that it stands by certain raised objections, that it has withheld certain documents as privileged, that it will produce certain

documents when available, and that certain documents are simply not within its control. It suggests, furthermore, that the court strike those requests which exceed the number of requests permitted to be served by the governing Scheduling Order. It claim no need to amend its privilege log, because it has nothing **[*10]** further to add. Plaintiff attaches to its reply brief a summation of its remaining objections to the responses of Mercury. (Insufficiencies of Mercury's Resps. to Sithon's Second Req. for Produc. of Docs. Dated Mar. 25, 1997, attached as Addendum 1 to Pl.'s Reply Brief [hereinafter Addendum 1].) The court deems all issues not contained in Addendum 1 as resolved, except for the issue of sanctions.

The court overrules the objection of Mercury to the number of requests served by plaintiff. Mercury made no such objection in response to the Second Request. Consequently, it waived such objection.

Mercury has fully responded to Requests 2, 3, 4, 5, 15, 36, and 39 by producing documents on July 11, 1997. In addition it has also apparently satisfactorily responded to Requests 16, 19, 21, 35, and 38. Plaintiff has no present dispute with the production to these requests. The court will thus deem the motion moot to the extent it seeks further production to Requests 2, 3, 4, 5, 15, 16, 19, 21, 35, 36, 38, and 39.

Plaintiff alleges that Mercury has failed to identify the Bates numbers of documents responsive to certain requests. This is the sole remaining dispute with respect to Request 20. **[*11]** Plaintiff seeks to compel such identification. Mercury contends that it has advised plaintiff as to the Bates number range of documents responsive to plaintiff's requests. It apparently has no objection to providing such identification. To the extent it has not already identified the documents produced in response to the Second Request by Bates numbers, it shall do so.

Plaintiff asks the court to order Mercury to provide an updated privilege log. Mercury states that no need exists for such update, as it has nothing to add to the existing log. Plaintiff has demonstrated no need for an update. Its reply brief, furthermore, indicates that it has abandoned the requested update. The court thus overrules the motion to that extent.

**Requests 1, 6, 7, 8, 9, 12, 13, 14, 17, and 18**

Plaintiff summarizes Requests 1, 6, 7, 8, 9, 12, 13, 14, 17, and 18 as seeking all "documents generated or maintained by Mercury personnel, its representative in Belgium, its

local representatives in Athens, Greece and Pefkohori, Greece concerning the propulsion systems of the Sithon passenger boats." Mercury responds that it "has previously produced all non-privileged" documents responsive to Request [*12] 7. Mercury objects to Request 9 on grounds of attorney-client privilege and work product. It nevertheless states that "it has previously produced all [responsive] documents which it has been able to locate." In response to Requests 12, 13, and 14 it states that "to the extent that responsive documents exist and have been located, [it has] previously produced them." It responds to Requests 17 and 18 by stating that it has already produced the information in prior disclosures and production of documents. In response to the motion it reiterates that it has no additional documents to produce. It stands by its initial responses.

Plaintiff suggests that Mercury cannot simply state that it is unable to locate additional documents. It further suggests that Mercury must specifically state that it has searched each of its three offices to confirm that no additional documents exist. It suggests that Mercury is still searching for responsive documents. It claims Mercury has agreed to supplement its response to Request 18. It seeks to compel any documents found or require Mercury to confirm in writing that no additional documents exist.

The court finds the responses of Mercury sufficient. [*13] Plaintiff apparently does not seek production of privileged documents. In response to certain requests Mercury states that it has produced all non-privileged documents. In response to others it states that it has produced all known documents. Plaintiff has no objection to accepting previously produced documents, as long as Mercury appropriately. identifies them by Bates number. The court has directed identification by Bates number. That Mercury may continue to search for responsive documents does not require a written confirmation that no other documents exist. Such search, if fruitful, may of course necessitate supplementation, pursuant to *Fed. R. Civ. P. 26(e)*. The court assumes parties will diligently discharge their duties under *Rule 26(e)*, unless adequate reason exists to assume otherwise. Plaintiff has presented no reason to believe Mercury will not comply with the supplementation requirements of *Rule 26(e)*. The court will compel no further response to Requests 7, 9, 12, 13, 14, 17, and 18.

Request 1 specifically asks Mercury to produce "all documents . . . concerning Mr. LeClerre's visit to Greece and inspection of one and/or all of the Sithon watercraft in August of 1995." [*14] Plaintiff contends that the response of Mercury provides no information regarding destroyed documents as required by the instruction section of the

Second Request. It seeks to compel such information. It also seeks to confirm that no other responsive documents presently exist or previously existed.

The Second Request contains the following introductory instruction:

> If any document(s) requested was at one time in existence but is no longer in existence, please supply a list identifying each such document and specifying in detail for each document; the generic category of such document (e.g., memorandum, letter, computer printout, etc.), the type(s) of information contained therein, the date upon which it ceased to exist, the circumstances under which it ceased to exist, and the identity of any and all person(s) having knowledge or who had knowledge of the contents thereof.

Although the propriety of such instruction in a request for production is questionable, Mercury apparently has no objection to it. It states only that it has no other documents to produce. It has agreed to formally supplement its response. Plaintiff contends that the supplementation falls far short [*15] of what is required by the introductory instruction. Mercury shall provide the requested information regarding destroyed documents. It shall also state unambiguously whether other responsive documents no longer exist.

Request 6 seeks "all of MotoMarine S.A.'s files and documents concerning the Sithon watercraft and/or their propulsion systems." Request 8 seeks the same documents of Mr. Magiras. Plaintiff characterizes Magiras as "the local Mercury representative in Chalkidiki, Greece."

Responding to Request 6, Mercury states that it has "previously produced all documents from the relevant time period that it has received from MotoMarine, S.A. When and if more documents are received, Mercury Marine will provide them." In response to Request 8 it objects to the characterization of Magiras. It states that he is an independent businessman. It nevertheless refers plaintiff to its response to Request 6. In response to the motion it reiterates that it has no additional documents to produce. It stands by its initial responses to the requests. It suggests that it cannot produce further documents responsive to Requests 6 and 8, because it has no control over the independent Greek entities.

[*16] Plaintiff claims that Mercury controls Magiras and MotoMarine S.A. It suggests the following facts clearly show the requisite control of Magiras:

(1) Magiras admitted under oath that he has been an authorized Mercury representative in Pefkohori, Greece since 1994; (2) on May 23, 1997, Magiras assisted Mercury in its inspection and sea trials of one of Sithon's boats; (3) Magiras permitted Mercury's counsel and its expert witness, Jack Riggleman, to photograph and withdraw oil samples from six of the Sithon returned engines that are presently in Magiras' workshop; (4) Mr. Magiras met with Mercury counsel on at least three occasions prior to his deposition to discuss this matter at length, at which time he most likely showed Mercury's counsel the same documents which Sithon seeks in this motion; and (5) finally, Magiras commenced his deposition as Mercury's witness on May 28, 1997.

(Objection to Request 24 of the letter of June 3, 1997; attached as Addendum 2 to Pl.'s Reply Brief, doc. doc. 143.) Plaintiff presents nothing to show any control by Mercury over MotoMarine, S.A. It seeks to compel all documents of MotoMarine, S.A. and Magiras.

Parties have a duty to produce [*17] all documents within their possession, custody, or control when responding to a request for production. *See Fed. R. Civ. P. 34(a).* "The federal courts have universally held that documents are deemed to be within the possession, custody or control of a party for purposes of *Rule 34* if the party has actual possession, custody or control of the materials or has the legal right to obtain the documents on demand." *National Union Fire Ins. Co. v. Midland Bancor, Inc., 159 F.R.D. 562, 566 (D. Kan. 1994)* (quoting *RTC v. Deloitte & Touche, 145 F.R.D. 108, 110 (D. Colo. 1992)).* "Control is defined as the legal right, authority, or ability to obtain upon demand documents in the possession of another. Under *Rule 34*, the term 'control' is construed broadly." *Florentia Contracting Corp. v. RTC, 1993 U.S. Dist. LEXIS 5275,* No. 92 Civ. 1188(PKL), *1993 WL 127187,* at *3 (S.D.N.Y. April 22, 1993). "The party seeking production of the documents . . . bears the burden of proving that the opposing party has such control." *United States v. International Union of Petroleum & Indus. Workers, AFL-CIO, 870 F.2d 1450, 1452 (9th Cir. 1989).*

Plaintiff has failed to demonstrate that Mercury has the requisite control over [*18] documents in the possession of Magiras or MotoMarine, S.A. The facts which supposedly show control over Magiras do not suffice. They fall well short of showing the requisite control. The proffered facts do not show that Magiras is anything but an independent contractor. The designation "authorized Mercury

representative" does not necessarily mean Magiras is either an employee or agent of defendant. Unless Mercury could order Magiras to surrender the documents to it, it lacks the requisite control. *See Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1426 (7th Cir. 1993).* Defendant has no duty to produce documents in the possession of another over which it has no control. With respect to MotoMarine, S.A., furthermore, plaintiff presents nothing of substance to show the requisite control. Conclusory statements do not suffice. The court will compel no further response to Requests 6 and 8.

**Requests 10 and 11**

Request 10 seeks "all Mercury telephone records, bills and/or logs for the period beginning September 1, 1994 through the present concerning and/or reflecting communications between Mercury personnel and Holiday Mansion." Request 11 seeks similar documents "concerning [*19] and/or reflecting communications between Mercury personnel and Sithon." Plaintiff subsequently limited these requests to the time period ending June 1, 1995. Although initially objecting to these requests on various grounds, Mercury states in response to the motion that it will produce all responsive billing records when it receives them from the phone company.

Plaintiff takes issue with the apparent inability of Mercury to obtain the necessary information from its telephone carrier. It also claims that Mercury has produced no telephone directories which list telephone-extensions of its employees. It suggests that such information is necessary to determine which employees of Mercury spoke with representatives of Holiday Mansion in late 1994 and early 1995.

Mercury shall produce all documents responsive to Requests 10 and 11. It has had ample opportunity to obtain necessary documents from its telephone carrier. Despite the broadly worded requests, the court does not view Requests 10 or 11 as encompassing telephone directories of employees of Mercury. Directories would not ordinarily reflect or concern communications between Mercury and anyone. Directories simply list telephone numbers. [*20] Mercury need not produce directories in response to Requests 10 or 11.

**Requests 22 through 33**

Requests 22, 23, 25, and 27 through 33 seek "all documents concerning" various testing and/or computer simulations of engines or stern drives and the results thereof. Requests 24 and 26 seek all documents concerning installations of Mercury 7.3L diesel engines with Bravo II and III stern drives.

Mercury claims to have produced its entire engineering file regarding the 7.3L diesel engine. It has offered to permit inspection of documents concerning quality control and "dyno" testing. It has produced all service bulletins concerning the 7.3L engine and the Bravo II and III stern drives. It claims to have produced all documents, which it could locate, concerning the history and testing of the specific engines installed on the boats of plaintiff. It states that it knows of no responsive documents concerning these items which it has not already produced. It nevertheless objects to producing development files on the Bravo II and III stern drives. It claims that documents concerning the development of the stern drives are irrelevant and gathering such documents would subject it to undue [*21] burden. It contends that Bravo II was not installed on the boats of plaintiff. It further contends that plaintiff has never alleged that the stern drives were flawed or failed. It claims that obtaining the necessary documents to respond would "likely" take weeks. It further claims that the undertaking would involve "tens of thousands, if not hundreds of thousands, of pages of documents." It asserts that the undertaking is unduly expensive and burdensome. It has abandoned all other objections it may have had to Requests 22 through 33. It has pursued no other objections to these requests in response to the motion.

The court overrules the objections. The requests are reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has alleged that defendant Mercury committed fraud with respect to transactions at issue in this case. (Am. Compl., doc. 204, PP 154-64.) It specifically states that "Mercury was well aware that various engines, stern drives . . . were defective, unrepaired, rejected, old, obsolete, used, pre-production, test, rebuilt, converted, previously sold, and/or incorrectly designed or configured." (*Id., P 157*.) Documents responsive to the requests [*22] appear relevant to the allegations of fraud. Defendant has not carried its burden, furthermore, to show the discovery unduly burdensome. The court thus finds that defendant has pursued no valid objection to Requests 22 through 33 in response to the motion.

The court next addresses the sufficiency of the responses of defendant. Plaintiff challenges the response to Requests 22, 25, 27, 30, and 32 by stating:

> Mercury's response only refers to quality control, dynamometer testing, and some water testing of the 7.3L diesel engine. Mercury makes no reference to computer simulations or any other tests conducted by Mercury on the 7.3L diesel engine. Mercury has not sufficiently responded and should

be compelled to produce these remaining categories of testing documents. Finally, if no other responsive documents exist, Mercury should be required to confirm this fact in a supplemental response.

(Addendum 1; Reqs. 22, 25, 27, 30, and 32.) Plaintiff challenges the response of Mercury to Request 23 to the extent the response refers to the allegedly insufficient response to Request 22.

Requests 22, 23, 25, 27, 30, and 32 encompass computer simulations and other tests conducted [*23] by Mercury on the 7.3L diesel engine. Mercury shall produce documents concerning computer simulations and other tests performed by Mercury on the 7.3L diesel engine. It shall also produce documents concerning problems detected or discovered during such testing. If it has no further documents responsive to these requests, it shall affirmatively state as much in a formal supplemental response.

Plaintiff contends the invoice listings provided in response to Requests 24 and 26 are insufficient. It complains of inexplicable codes and abbreviations within such listings. It argues that responsive documents, furthermore, would contain the name, address, and telephone number of purchasers of the 7.3L diesel engine.

*Fed. R. Civ. P. 34(b)* provides that "[a] party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." One does not violate this requirement by producing documents containing codes and abbreviations with meanings unknown to the recipient, unless the producing party does not keep such documents in that format in the usual course of business. Plaintiff [*24] presents no reason to believe that Mercury produced the invoice listings other than as kept in the usual course of business. *Rule 34* has no requirement that a responding party explain the codes and abbreviations contained within produced documents. Other discovery or informal investigation serves to obtain an explanation of the contents of produced documents.

The court finds, however, that documents responsive to Request 24 and 26 would likely contain names, addresses, and telephone numbers of those individuals who had Mercury's 7.3L diesel engine with Bravo II or III stern drives installed in water craft during the relevant time period. Mercury shall produce documents with such information. If it has no such documents, it shall affirmatively state as much in a formal supplementation.

In response to Requests 28 and 29 defendant states that "all reasonably accessible responsive documents have been [sic]

both in prior production, or at the recent depositions of Mercury Marine personnel." Plaintiff contends that defendant produced no documents responsive to Request 28, until three weeks after the filing of the present motion to compel. It further contends that such production did [*25] not include information "such as computer simulations, repair records, etc." It wants such information produced, "if its [sic] exists or existed at one time." (Addendum 1, Req. 28.) Plaintiff also contends that defendant has produced no documents in response to Request 29. It wants defendant to produce responsive documents forthwith or provide a written response, which indicates that its good faith search revealed no responsive documents. (Addendum 1, Req. 29.)

The responses of defendant fall short. When a party responds to a request for production, it does not necessarily fulfill its duty by producing all documents "reasonably accessible" to it. Parties must produce all responsive documents, assert a legitimate objection to such production, or obtain an extension of time, if necessary. If the accessibility of the documents is such that production would be unduly burdensome, the respondent must affirmatively state such objection in its response to the request. The court will not speculate. It does not construe the response of defendant to encompass an objection of undue burden. Defendant has thus stated no timely objection to Requests 28 and 29. It shall produce all documents responsive [*26] to them, including computer simulations "concerning" any relevant tests it conducted. It need not produce repair records. The Requests do not reasonably encompass such documents. *Rule 34* requires production of documents within the respondent's custody, possession, or control. A respondent cannot produce documents which do not exist. If no documents exist with respect to Request 29, defendant shall affirmatively state that its good faith search uncovered no responsive documents.

Request 31 seeks "all documents concerning any on-water testing, dynamometer testing, quality control testing and/or computer simulations, involving any Mercury 7.3L diesel engines installed with Bravo II stern drives." The court has overruled the objections of defendant. Defendant shall produce all documents responsive to Request 31.

Request 33 seeks "all documents concerning any reject cards generated as a result of the testing described in Requests Nos. 22 through 32." Defendant has apparently informed plaintiff that it maintains no reject cards. Plaintiff asks the court to compel defendant to produce all such documents. It asserts that defendant has proffered no reason as to why it cannot produce such [*27] information or parallel information, such as a listing of "reject" 7.3 L diesel

engines. It contends that prior disclosures indicate that defendant has some means to determine whether an engine has previously been rejected.

The court cannot compel defendant to produce documents that it does not have. It thus cannot compel production of "reject cards." Request 33, however, is not limited to reject cards. Responsive documents would include any document concerning the specified reject cards. Accordingly, defendant shall produce all documents responsive to Request 33. It shall not unilaterally limit the request to reject cards. If defendant has no such documents, it shall state that in a supplemental response to the request.

**Requests 34 and 37**

Requests 34 and 37 seek "all documents concerning the termination of the employment of Patrick LeClerre [and John Brophy]." Defendant objects that responsive documents are irrelevant and confidential. It proposes *in camera* inspection by the court. Plaintiff has no objection to such inspection, if the court deems the procedure appropriate.

Requests 34 and 37 appear reasonably calculated to lead to the discovery of admissible evidence. [*28] Mercury employed Messrs. LeClerre and Brophy during the time period relevant to this lawsuit. Both individuals played a significant part in the actions leading to this litigation. After Mercury terminated Mr. LeClerre, it disposed of documents left in his office. When discovery appears relevant, the party opposing discovery has the burden to show the discovery not relevant. Mercury has not carried that burden. Accordingly, the court finds documents responsive to Requests 34 and 37 relevant.

Confidentiality, furthermore, generally does not constitute grounds to withhold information from discovery. Confidentiality does not equate to privilege. *Federal Open Mkt. Comm. v. Merrill, 443 U.S. 340, 362, 61 L. Ed. 2d 587, 99 S. Ct. 2800 (1979)*. Defendant has shown no privilege applicable to the requested discovery. It simply asserts that the discovery seeks confidential information. Bald assertions of confidentiality, however, are insufficient either to substantiate the fact or to make otherwise discoverable information non-discoverable. The court overrules the objections based upon confidentiality.

The court next addresses the proposed *in camera* inspection. The Supreme Court "has [*29] approved the practice of requiring parties who seek to avoid disclosure of documents to make the documents available for *in camera* inspection." *United States v. Zolin, 491 U.S. 554, 569, 105 L. Ed. 2d 469,*

*109 S. Ct. 2619 (1989)*. "The decision whether to review [documents] *in camera* is within the sound discretion of the trial court." *United States v. Anderson (In re Grand Jury Subpoenas), 906 F.2d 1485, 1493 (10th Cir. 1990)*. The court may and does review documents *in camera* to determine an alleged privilege, when the party asserting it has made some initial, factual showing that it exists. Although the court "has discretion in determining whether to conduct an *in camera* review of documents claimed to be privileged, protected or otherwise entitled to confidentiality . . . the Court must have some bases or grounds for conducting an *in camera* review." *Mason C. Day Excavating, Inc. v. Lumbermens Mut. Cas. Co.*, 143 F.R.D. 601, 604 (M.D.N.C. 1992) (citations omitted).

> Such review may be useful if there is a genuine dispute between the parties as to the accuracy of the withholding party's description of certain documents. Such review is not, however, [*30] to be routinely undertaken, particularly in a case involving a substantial volume of documents, as a substitute for a party's submission of an adequate record in support of its privilege claims.

*Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465, 475 (S.D.N.Y. 1993)* (citations omitted).

Defendant has provided no adequate reason to require or justify an *in camera* inspection. It has presented no compelling need for it. It alleges that the documents are confidential and irrelevant. At the discovery stage of litigation the court seldom conducts an *in camera* review simply to determine questions of relevancy. In this instance it has resolved the issue of relevancy. Although the court may review allegedly confidential documents *in camera*, defendant has shown no justifiable reason to do so in this instance. Defendant has not even adequately shown the requested documents to be confidential. It has shown no harm which might arise by producing the requested documents. It has also not shown why a protective order would not suffice, if indeed grounds for protection exist.

**Sanctions on the Motion to Compel**

Ruling upon a motion to compel invites consideration [*31] of sanctions. *Fed. R. Civ. P. 37(a)(4)*. In this instance the court has sustained the motion in part and overruled it in part. It thus has discretion to "apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner." *Fed. R. Civ. P. 37(a)(4)(C)*. Although the court is tempted to assess a greater share of the costs on plaintiff for moving to compel responses to informal requests, the court finds that on balance justice requires each party to be responsible for its own expenses incurred on the motion and subsequent briefing. Both Mercury and plaintiff took legitimate positions on some portions of the motion. Responsibility for the dispute, furthermore, does not clearly lie with one party over the other.

**Conclusion**

For the foregoing reasons, the court sustains in part, deems moot in part, and otherwise overrules Plaintiff--Sithon Maritime Company's Motion to Compel the Production of Documents by Defendant-Mercury Marine (doc. 119). It deems the motion moot to the extent it seeks further production to Requests 2, 3, 4, 5, 15, 16, 19, 21, 35, 36, 38, and 39 of Plaintiff's Second Request for Production of Documents. Within [*32] twenty days of the date of this order, defendant Mercury Marine shall fully comply with the orders set forth herein. It shall produce documents responsive to Requests 1, 22 through 34, and 37, as directed herein. Such production shall take place at the offices of counsel for plaintiff located at 7400 West 110th Street, Overland Park, Kansas, or at any other location agreed upon by the parties. Mercury shall identify, by Bates numbers, all documents which it has produced or will produce in response to the Second Request, as directed herein. It shall supplement its responses to the Second Request, as herein directed. Each party shall be responsible for its own costs and expenses incurred upon the motion and other briefing. The court otherwise overrules the motion.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 10th day of April, 1998.

Gerald L. Rushfelt

United States Magistrate Judge